[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Clay v. Cuyahoga Cty. Med. Examiner's Office,* Slip Opinion No. 2017-Ohio-8714.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2017-OHIO-8714

THE STATE EX REL. CLAY, APPELLEE, *v.* CUYAHOGA COUNTY MEDICAL EXAMINER'S OFFICE, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Clay v. Cuyahoga Cty. Med. Examiner's Office,* Slip Opinion No. 2017-Ohio-8714.]

*Coroner's records—Next of kin—Records request by incarcerated person—R.C. 313.10(C)(1) is plain and unambiguous and provides relator, as next of kin, the right to receive a copy of the full and complete records of the coroner with respect to his daughter, for whose murder he is incarcerated—Public Records Act—Requests under R.C. 313.10(C)(1) are not subject to R.C. 149.43(B)(8)'s restrictions on requests by incarcerated persons.*

(No. 2016-0387—Submitted May 16, 2017—Decided November 30, 2017.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 103514, 2016-Ohio-407.

_____

**Kennedy, J.**

**{¶ 1}** The Cuyahoga County Medical Examiner's Office ("ME") appeals the judgment of the Eighth District Court of Appeals granting a writ of mandamus to compel the release of autopsy records to relator-appellee, Michael Clay, under R.C. 313.10(C)(1). The ME had argued that when R.C. 313.10 is read in pari materia with R.C. 149.43, the Public Records Act, it is clear that the ME had no duty to provide the records to Clay. The court of appeals denied the ME's motion for summary judgment and granted judgment in favor of Clay on the basis that the in pari materia rule of statutory construction is not applicable because R.C. 313.10 and 149.43 do not relate to the same subject matter. 2016-Ohio-407, 58 N.E.3d 552, ¶ 8.

**{¶ 2}** "Where the language of a statute is plain and unambiguous * * * there is no occasion for resorting to rules of statutory interpretation. An unambiguous statute is applied, not interpreted." *Sears v. Weimer*, 143 Ohio St. 312, 55 N.E.2d 413 (1994), paragraph five of the syllabus. Because the language of R.C. 313.10(C)(1) is plain and unambiguous, we apply the plain terms of the statute. Therefore, we affirm the judgment of the court of appeals, albeit on different grounds.

## I. Case Background

**{¶ 3}** On August 28, 2006, Clay's eight-month-old daughter, M.C., died as a result of blunt-force impacts to her head. *State v. Clay*, 9th Dist. Summit No. 23889, 2008-Ohio-2158, ¶ 2. Clay was convicted of murder, felonious assault, and child endangering in connection with her death and sentenced to 15 years to life in prison. *Id*. at ¶ 7.

**{¶ 4}** On April 15, 2015, while imprisoned, Clay sent a letter addressed to the ME, requesting all copies of x-rays, autopsy photos, the death certificate, and written doctors' reports pertaining to his deceased daughter. In support, Clay cited R.C. 149.43 and 313.10. In response, the ME provided some documents but not

the ones that Clay had requested. The ME also advised that the death certificate could be acquired through "Cleveland City Hall" and that the other records were not available without a subpoena. On April 24, 2015, Clay sent a second request to the ME. The ME did not provide any further records.

{¶ 5} Consequently, Clay filed an original action in the Eighth District Court of Appeals seeking a writ of mandamus to compel the ME to provide him the requested records, but, unlike his request by letter, the complaint relied solely upon R.C. 313.10(C). In response, the ME filed a motion to dismiss and/or for summary judgment.

{¶ 6} On February 3, 2016, the court of appeals denied the ME's summary-judgment motion and issued a writ of mandamus compelling the ME to provide the complete autopsy file to Clay within a reasonable period of time. 2016-Ohio-407, 58 N.E.3d 552, at ¶ 9. The ME timely appealed and asserts two propositions of law. The first states:

> R.C. 149.43 and R.C. 313.10 relate to the same general subject, access to coroners' records, and must be construed in pari materia.

The second states:

> A coroner's office is not required to permit a person who is incarcerated pursuant to a criminal conviction to inspect or to obtain a copy of records concerning a death investigation if the person requesting the record is incarcerated for causing the death of the person who is the subject of the record unless the incarcerated person has complied with R.C. 149.43(B)(8), regardless of whether the incarcerated person is the next-of-kin of the decedent.

**{¶ 7}** In response to the ME's propositions of law, Clay argues that his complaint for a writ of mandamus was solely based on R.C. 313.10. Relying on the language of R.C. 313.10(C)(1), Clay argues that he has a clear legal right to—and the ME has a clear legal duty to provide him with—a copy of the complete autopsy file.

**{¶ 8}** Writing in support of the ME, amicus curiae, Ohio State Coroners Association, argues that public policy weighs against the release of autopsy files to next-of-kin convicted murderers and that therefore, the court of appeals' judgment that failed to harmonize R.C. 313.10 and 149.43 must be reversed.

## II. Standard of Review

**{¶ 9}** The court of appeals denied the ME's motion for summary judgment and granted judgment as a matter of law in favor of Clay. 2016-Ohio-407, 58 N.E.3d 552, at ¶ 9. When a party moves for summary judgment and the nonmovant has had an opportunity to respond, a court—after consideration of the relevant evidence—may enter judgment against the moving party even though the nonmovant did not file its own motion for summary judgment. *State ex rel. Anderson v. Vermilion*, 134 Ohio St.3d 120, 2012-Ohio-5320, 980 N.E.2d 975, ¶ 8, citing *Todd Dev. Co., Inc. v. Morgan*, 116 Ohio St.3d 461, 2008-Ohio-87, 880 N.E.2d 88, ¶ 17. We review that determination de novo. *Id*. at ¶ 9, citing *Troyer v. Janis*, 132 Ohio St.3d 229, 2012-Ohio-2406, 971 N.E.2d 862, ¶ 6.

## III. Mandamus

**{¶ 10}** To be entitled to a writ of mandamus, Clay must establish a clear legal right to the requested relief, a clear legal duty on the part of the ME to provide it, and the lack of an adequate remedy in the ordinary course of the law. *State ex rel. Waters v. Spaeth*, 131 Ohio St.3d 55, 2012-Ohio-69, 960 N.E.2d 452, ¶ 6. Clay has the burden to prove that he is entitled to the writ by clear and convincing evidence. *Id*. at ¶ 13.

**IV. Statute at Issue**

{¶ 11} As set forth above, Clay based his complaint for a writ of mandamus solely on his rights as a next of kin under R.C. 313.10(C)(1).

{¶ 12} R.C. 313.10 governs access to records held by a coroner's office. The ME is the coroner for Cuyahoga County. *See* R.C. 313.01(B)(1) (definition of "coroner" includes the "medical examiner of the county"); Cuyahoga County Charter, Section 5.03 (coroner's power vested in medical examiner).

{¶ 13} The statute begins by designating all records of the coroner to be public records. R.C. 313.10(A)(1). The next subsection carves out exceptions, declaring that documents such as preliminary autopsy and investigative notes and findings, photographs, and suicide notes are not public records. R.C. 313.10(A)(2)(a) through (f). Finally, the statute allows a "next of kin of a decedent" to receive records of the office:

> The coroner shall provide a copy of the full and complete records of the coroner with respect to a decedent to a person who makes a written request as the next of kin of the decedent. The following persons may make a request pursuant to this division as the next of kin of a decedent:
>
> * * *
>
> (c) If there is no surviving spouse or child over eighteen years of age, * * * the parents of the decedent, with each parent having an independent right to make a request pursuant to this division.

R.C. 313.10(C)(1).

**V. Law and Analysis**

{¶ 14} When construing the language of a statute, we begin with a familiar objective: a determination of the intent of the General Assembly. *Caldwell v. State*, 115 Ohio St. 458, 466, 154 N.E. 792 (1926). Almost two centuries ago, Chief Justice Marshall of the United States Supreme Court wrote, "The intention of the legislature is to be collected from the words they employ. Where there is no ambiguity in the words, there is no room for construction." *United States v. Wiltberger*, 18 U.S. 76, 95-96, 5 L.Ed. 37 (1820).

{¶ 15} In keeping with Chief Justice Marshall's words, this court has held that "[t]he primary rule in statutory construction is to give effect to the legislature's intention," *Cline v. Bur. of Motor Vehicles*, 61 Ohio St.3d 93, 97, 573 N.E.2d 77 (1991), citing *Carter v. Youngstown Div. of Water*, 146 Ohio St. 203, 65 N.E.2d 63 (1946), paragraph one of the syllabus, by looking at the language of the statute, *Stewart v. Trumbull Cty. Bd. of Elections*, 34 Ohio St.2d 129, 130, 296 N.E.2d 676 (1973). When there is no ambiguity, we must abide by the words employed by the General Assembly, *see State v. Waddell*, 71 Ohio St.3d 630, 631, 646 N.E.2d 821 (1995), and have no cause to apply the rules of statutory construction, *see Hulsmeyer v. Hospice of Southwest Ohio, Inc.*, 142 Ohio St.3d 236, 2014-Ohio-5511, 29 N.E.3d 903, ¶ 22-23. "We 'do not have the authority' to dig deeper than the plain meaning of an unambiguous statute 'under the guise of either statutory interpretation or liberal construction.' " *Jacobson v. Kaforey*, 149 Ohio St.3d 398, 2016-Ohio-8434, 75 N.E.3d 203, ¶ 8, quoting *Morgan v. Adult Parole Auth.*, 68 Ohio St.3d 344, 347, 626 N.E.2d 939 (1994).

{¶ 16} The ME's first proposition of law argues that the court should use the in pari materia rule of statutory construction in determining the meaning of R.C. 313.10(C)(1). We disagree.

{¶ 17} The in pari materia rule of statutory construction applies to "statutes relating to the same general subject matter," *State ex rel. Gains v. Rossi*, 86 Ohio

St.3d 620, 622, 716 N.E.2d 204 (1999), citing *Cater v. Cleveland*, 83 Ohio St.3d 24, 29, 697 N.E.2d 610 (1998), but it is applied only "where some *doubt or ambiguity exists* in the wording of a statute" (emphasis added), *State ex rel. Celebrezze v. Allen Cty. Bd. of Commrs.*, 32 Ohio St.3d 24, 27-28, 512 N.E.2d 332 (1987), citing *Hough v. Dayton Mfg. Co.*, 66 Ohio St. 427, 434, 64 N.E. 521 (1902); *see also Hulsmeyer*, 142 Ohio St.3d 236, 2014-Ohio-5511, 29 N.E.3d 903, at ¶ 22. Under our rules of statutory construction, ambiguity means that the statutory provision is "capable of bearing more than one meaning." *Dunbar v. State*, 136 Ohio St.3d 181, 2013-Ohio-2163, 992 N.E.2d 1111, ¶ 16, citing *Fairborn v. DeDomenico*, 114 Ohio App.3d 590, 593, 683 N.E.2d 820 (2d Dist.1996).

{¶ 18} The ME does not argue that the words employed by the General Assembly are ambiguous or capable of more than one meaning. And we cannot, after reading the statute and giving the words the legislature chose their plain and ordinary meanings, find that the words of the statute are ambiguous. Therefore, the in pari materia rule of statutory construction is not applicable.

{¶ 19} The ME's second proposition of law argues that despite the language of R.C. 313.10 that grants a next of kin the right to a copy of the autopsy records of a decedent upon written request, an ME can deny that request pursuant to R.C. 149.43(B)(8) if the next of kin caused the death of the decedent. Again, we disagree.

{¶ 20} The plain and unambiguous language that the General Assembly employed in R.C. 313.10(C)(1) does not qualify the applicability of the "next of kin" provision with the conditions set out in R.C. 149.43(B)(8). As the ME correctly points out, the legislature makes three express references to the applicability of R.C. 149.43 elsewhere in R.C. 313.10. However, R.C. 313.10(C)(1) does not contain any reference to R.C. 149.43.

{¶ 21} The ME further argues that if this court does not reverse the appellate court's judgment and harmonize R.C. 149.43 with R.C. 313.10, it would lead to an

absurd or unreasonable result. In support of that argument, the ME relies on *Columbia Gas Transm. Corp. v. Levin*, 117 Ohio St.3d 122, 2008-Ohio-511, 882 N.E.2d 400, ¶ 35. The ME's argument rings hollow, however, because the argument is based on an erroneous construction of the absurd-result exception to the plain-meaning rule of statutory construction and a misreading of *Columbia Gas Transm. Corp.*

{¶ 22} "The absurd result principle in statutory interpretation provides an *exception* to the rule that a statute should be interpreted according to its plain meaning." (Emphasis added.) Dougherty, *Absurdity and the Limits of Literalism: Defining the Absurd Result Principle in Statutory Interpretation*, 44 Am.U.L.Rev. 127 (1994). It is premised on a guiding principle of statutory construction: that when the General Assembly enacts a statute, it does not intend to produce an absurd result. *See* R.C. 1.47(C). The starting point of that analysis is the language of the statutory provision. *See Canton v. Imperial Bowling Lanes, Inc.*, 16 Ohio St.2d 47, 53, 242 N.E.2d 566 (1968).

{¶ 23} In *Columbia Gas Transm. Corp.*, this court was construing the meaning of a tax statute, which requires "strict construction against the state, with any doubt resolved in favor of the taxpayer." *Id*. at ¶ 34. We noted, however, that there is an absurdity exception to the strict-construction doctrine. *Id*. at ¶ 35. If strict construction of a statute would result in "unreasonable or absurd consequences," a construing court may reject the strict-construction doctrine, because courts must presume that the legislature enacted a statute for a "just and reasonable result." *Id*., citing *Gulf Oil Corp. v. Kosydar*, 44 Ohio St.2d 208, 339 N.E.2d 820 (1975), paragraph two of the syllabus, and R.C. 1.47(C).

{¶ 24} Similarly, in *State ex rel. Cooper v. Savord*, this court held that "[i]t is the duty of the courts, if the language of a statute fairly permits or unless restrained by the clear language thereof, so to construe the statute as to avoid [an unreasonable or absurd] result. 153 Ohio St. 367, 92 N.E.2d 390 (1950), paragraph

one of the syllabus. In *Cooper*, the court was asked to determine the meaning of Section 12000 of the General Code, which permitted a change of venue from the court in which a petition for divorce or alimony "is filed." *Id*. at 368-369. The appellate court, recognizing the mandatory language of the statute, had held that either party was entitled to a change of venue upon application, even if a change of venue had already been granted. *Id*. at 369-370. This court, relying on the word "filed" and the consideration that the General Assembly could not have intended that a "change of venue be continued indefinitely," reversed the judgment of the appellate court. *Id*. at 371.

{¶ 25} In this case, the ME does not argue that application of the plain language of R.C. 313.10 creates an absurd result. Instead, the ME argues that when the plain language of R.C. 313.10 is read in conjunction with R.C. 149.43, an absurd consequence results. This construction, however, is beyond the boundary of the absurd-result exception.

{¶ 26} The absurd-result exception to the plain-meaning rule of construction "entails the imputation of legislative intent based on the judge's perception" and "vastly expands the [c]ourt's authority." Manning, *The Absurdity Doctrine*, 116 Harv.L.Rev. 2387, 2476 (2003). Therefore, all courts should exercise restraint in the application of the absurd-result exception, employing it in only those cases in which the plain language of a statute results in an obviously unintended result. Scalia & Garner, *Reading Law*: *The Interpretation of Legal Texts* 239 (2012) ("The doctrine of absurdity is meant to correct obvious *unintended* dispositions, not to revise purposeful dispositions that, in light of other provisions of the applicable code, make little if any sense" [emphasis sic]).

{¶ 27} Because the plain language of R.C. 313.10 does not lead to an absurd result in this case, the absurdity exception to the plain-language rule of statutory construction does not apply.

**{¶ 28}** The dissent argues, however, that we have misconstrued our absurd-result jurisprudence, and it relies on *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, to underscore the point. However, a close examination of that case demonstrates that in *White*, this court did not, as the dissent posits, read R.C. 2941.145(A) in pari materia with R.C. 2935.03(A)(1) and 2921.44(A)(2) to distill the General Assembly's intention for enacting the firearm specification that was at issue. *See White* at ¶ 31-35. Rather, we relied on this court's prior statements in *State v. Powell*, 59 Ohio St.3d 62, 63, 571 N.E.2d 125 (1991), regarding the purpose of firearm specifications. *White* at ¶ 31. We referred to the aforementioned statutes merely to bolster our conclusion that R.C. 2941.145(A) "is not intended to deter a peace officer from possessing a firearm." *Id.* at ¶ 31-32.

**{¶ 29}** Even if R.C. 313.10(C)(1)(c) and 149.41(B)(8) were required to be read in pari materia as the dissent argues—a conclusion that we reject—our precedents provide that when statutes of " 'interrelated bod[ies] of law' " are construed together and are found to conflict, *Summerville v. Forest Park*, 128 Ohio St.3d 221, 2010-Ohio-6280, 943 N.E.2d 522, ¶ 24, quoting *State v. Moaning*, 76 Ohio St.3d 126, 128, 666 N.E.2d 1115 (1996), " 'the rules of statutory construction contained in R.C. 1.12, 1.51, and 1.52' " are controlling, *id.* at ¶ 26, quoting *Davis v. State Personnel Bd. of Rev.*, 64 Ohio St.2d 102, 105, 413 N.E.2d 816 (1980). In accord with those provisions, " 'a specific statute, enacted later in time than a preexisting general statute, will control where a conflict between the two arises.' " *Id.*, quoting *Davis* at 105.

**{¶ 30}** The provision at issue, R.C. 313.10(C)(1)(c), is a specific statutory provision that provides that "[t]he coroner shall provide a copy of the full and complete records of the coroner" to the "next of kin"—in this case, the decedent's parent. R.C. 313.10(C)(1)(c) was enacted by the General Assembly in 2006, Am.Sub.H.B. No. 235, 151 Ohio Laws, Part IV, 7190-7193, 7211, and

specifically applies to records kept by the coroner that the General Assembly has deemed public and nonpublic.

{¶ 31} In contrast, R.C. 149.43(B)(8), the provision of the Public Records Act that the dissent construes in pari materia with R.C. 313.10(C)(1)(c), was enacted in 1999 (first codified as R.C. 149.43(B)(4)), Am.Sub.S.B. No. 78, 148 Ohio Laws, Part IV, 8623, 8627, 8631, and is a general statute that applies to other public records "concerning a criminal investigation or prosecution" that are requested by incarcerated persons. The more specific, later-enacted statute, R.C. 313.10(C)(1), would prevail if R.C. 313.10(C)(1) and 149.43(B)(8) irreconcilably conflicted. *See Summerville* at ¶ 26.

{¶ 32} In reality, however, the ME's construction of the absurd-result exception is really akin to the rule of statutory construction stating that "[i]f a statute is ambiguous, the court, in determining the intention of the legislature, may consider * * * [t]he consequences of a particular construction," R.C. 1.49(E). However, that rule of statutory construction is applicable only when the language of the statute being construed is found to be ambiguous. *Id.* Because R.C. 313.10 is not ambiguous, the "consequences of a particular construction" rule is not applicable.

{¶ 33} The parties do not dispute that Clay does not have an adequate remedy at law or that he is the next of kin to the decedent. The crux of the dispute is the ME's argument that Clay is not entitled to a writ of mandamus because he has no clear legal right to—and the ME has no clear legal duty to provide—the autopsy records.

{¶ 34} R.C. 313.10(C)(1) states that "[t]he coroner *shall provide* a copy of the *full and complete records of the coroner* with respect to a decedent to a person who makes a written request as the next of kin of the decedent." (Emphasis added.) "Next of kin" includes "parents of the decedent." R.C. 313.10(C)(1)(c). "[U]se of the term 'shall' in a statute or rule connotes a mandatory obligation unless other

language evidences a clear and unequivocal intent to the contrary." *State ex rel. Cincinnati Enquirer v. Lyons*, 140 Ohio St.3d 7, 2014-Ohio-2354, 14 N.E.3d 989, ¶ 28, citing *Dorrian v. Scioto Conservancy Dist.*, 27 Ohio St.2d 102, 271 N.E.2d 834 (1971), paragraph one of the syllabus. There is no clear or unequivocal language in R.C. 313.10 that indicates that "shall" imposes other than a mandatory duty on the coroner to provide the "next of kin" "a copy of the full and complete records" regarding the decedent.

{¶ 35} Thereafter, the legislature begins the definition of the phrase "full and complete records of the coroner" with the words "includes, but is not limited to, the following." R.C. 313.10(G). "The statutory phrase 'including, but not limited to' means that the examples expressly given are 'a *nonexhaustive* list of examples.' (Emphasis sic.)." *State v. Anderson*, 138 Ohio St.3d 264, 2014-Ohio-542, 6 N.E.3d 23, ¶ 45, quoting *State v. Muncie*, 91 Ohio St.3d 440, 448, 746 N.E.2d 1092 (2001). Therefore, the documents listed in R.C. 313.10(G) do not necessarily constitute the entire list of documents that make up the "full and complete records of the coroner."

{¶ 36} Clay made a written request to the ME asking for copies of x-rays, autopsy photos, the death certificate, and written doctors' reports pertaining to his deceased daughter. The photographs and written doctor's reports requested by Clay are expressly included as part of the "full and complete record" of the coroner as defined in R.C. 313.10(G)(1). And while x-rays are not expressly listed in R.C. 313.10(G)(1), coroners often take x-rays during autopsies, *see http://medicalexaminer.cuyahogacounty.us/en-us/autopsy.aspx* (accessed Sept. 8, 2017), and based on the breadth of the definition of the term "full and complete records of the coroner," x-rays, if taken, would be included. However, death certificates are "vital records" pursuant to R.C. 3705.01(O), and they can be acquired through the city of Cleveland's Bureau of Vital Statistics, *see*

*http://www.cuyahogacounty.us/en-us/public-records-faqs.aspx* (accessed Sept. 8, 2017).

**{¶ 37}** Except for the death certificate, the records requested by Clay, who is a next of kin of the decedent for purposes of R.C. 313.10(C), are within the full and complete records of the coroner. Therefore, Clay has a clear legal right to those records and the ME has a clear legal duty to provide the requested records.

**{¶ 38}** While we are acutely aware of the fact that Clay has been convicted of and is currently incarcerated for the heinous act of murdering his daughter and that he is using R.C. 313.10(C)(1) to obtain records from the coroner's office related to the child that he murdered, the plain language of the statute nevertheless grants him access to those records.

**{¶ 39}** Courts should be ever mindful that "[j]ustice is even-handed and equally administered to all, irrespective of any and all considerations." *Koppelman v. Commr. of Internal Revenue*, 202 F.2d 955, 956 (3d Cir.1953) (Kalodner, J., dissenting). Even when dealing with an "unsympathetic party," a court "should not abandon settled rules of law merely to correct what we perceive to be an improper result." *West v. Goldstein*, 830 S.W.2d 379, 388 (Ky.1992) (Lambert, J., dissenting).

> [C]ourts are not at large. * * * They are under the constraints imposed by the judicial function in our democratic society. As a matter of verbal recognition certainly, no one will gainsay that the function in construing a statute is to ascertain the meaning of words used by the legislature. To go beyond it is to usurp a power which our democracy has lodged in its elected legislature. * * * A Judge must not rewrite a statute, neither to enlarge nor to contract it. Whatever temptations the statesmanship of policy-making might wisely suggest, construction must eschew interpolation and

evisceration.  He must not read in by way of creation.  He must not read out except to avoid patent nonsense or internal contradiction.

* * *

[T]he only sure safeguard against crossing the line between adjudication and legislation is an alert recognition of the necessity not to cross it and instinctive, as well as trained, reluctance to do so.

Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum.L.Rev. 527, 533, 535 (1947).

**{¶ 40}** Because our role as members of the judiciary is not " 'to establish legislative policies or to second-guess the General Assembly's policy choices,' " *Stetter v. R.J. Corman Derailment Servs., L.L.C.*, 125 Ohio St.3d 280, 2010-Ohio-1029, 927 N.E.2d 1092, ¶ 35, quoting *Groch v. Gen. Motors Corp.*, 117 Ohio St.3d 192, 2008-Ohio-546, 883 N.E.2d 377, ¶ 212, or to declare that the General Assembly by way of inadvertence or inattention made a slip of the pen in an attempt to rewrite the statute in a manner that is pleasing to us, we must adhere to the plain language of the statute.  If after reflection on our decision, the General Assembly finds that its original intention was not accomplished in the words that it chose, then it, and it alone, has the constitutional authority to amend the statute to conform to its intention.

## VI. Conclusion

**{¶ 41}** The in pari materia rule of statutory construction and the absurdity exception to the plain-language rule of statutory construction are not applicable to R.C. 313.10(C)(1).  Because R.C. 313.10(C)(1) is plain and unambiguous, we apply the statute as written.  Therefore, we affirm the judgment of the court of appeals, albeit on different grounds.

Judgment affirmed.

O'DONNELL and DeWINE, JJ., concur.

FISCHER, J., concurs in judgment only, with an opinion joined by O'DONNELL, J., to the extent that it encourages the General Assembly to address the issue.

O'CONNOR, C.J., dissents, with an opinion joined by FRENCH and O'NEILL, JJ.

_____

**FISCHER, J., concurring in judgment only.**

{¶ 42} The lead and dissenting opinions consider the relationship between two statutes appearing in separate titles of the Revised Code and disagree on how to apply our absurd-result jurisprudence. Rather, the statutes address different avenues by which a requestor can obtain different sets of records. The fact that there is some overlap between the two sets of records does not create any relevant relationship between the statutes. R.C. 313.10(C)(1) places a clear and mandatory legal duty on the "coroner" for Cuyahoga County—respondent, the Cuyahoga County Medical Examiner's Office ("ME")—to provide relator, Michael Clay, certain records, and R.C. 149.43(B)(8) does not relieve the ME of that duty.

{¶ 43} R.C. 149.43(B)(8) provides that a public official has the discretion to deny a public-records request received from an incarcerated person unless a judge approves the request. A coroner must apply R.C. 149.43(B)(8) only when an incarcerated person submits *a public-records request*.

{¶ 44} R.C. 313.10(C)(1) provides that a coroner has a clear and mandatory legal duty to provide the "next of kin" ("NOK") the "full and complete records of the coroner with respect to a decedent" if the NOK submits a written request for those records. A coroner must apply R.C. 313.10(C)(1) when the NOK makes a request pursuant to the coroner-records statute.

{¶ 45} It is true that *some* of the records that form part of the "full and complete records of the coroner" are public records. Nonetheless, R.C. 149.43(B)(8) governs how a public official may respond to *a public-records*

*request*; it does not govern how a coroner should respond to records requests made pursuant to R.C. 313.10(C)(1). R.C. 313.10(C)(1) does not include a caveat that any such request is subject to the limitations or discretion provided by R.C. 149.43(B)(8).

{¶ 46} Here, as the lead opinion correctly notes, Clay submitted a letter to the ME requesting records related to his daughter, and he cited *both* R.C. 149.43 and 313.10. After the ME's response to these requests did not satisfy Clay, he filed an action in mandamus arguing that the ME failed to provide him records which the General Assembly has stated that coroners *shall* provide pursuant to R.C. 313.10(C). By enacting R.C. 313.10(C)(1), the General Assembly created the mandatory duty for the ME to provide Clay, the NOK, with the "full and complete records of the coroner" with respect to his deceased daughter. The discretion provided to the ME pursuant to R.C. 149.43(B)(8) has no effect on Clay's request filed pursuant to R.C. 313.10(C)(1). For these reasons, I agree with the lead opinion's conclusion that we should affirm the court of appeals' judgment granting Clay a writ of mandamus.

{¶ 47} Despite reaching this conclusion, I share some of the concerns raised in the dissenting opinion. R.C. 310.10(C)(1) is clear and unambiguous, and we must apply that statute as written; however, this result seems out of step with the General Assembly's apparent policy decision to limit incarcerated persons' access to public records. *See* R.C. 149.43(B)(8). Additionally, this result seems out of place considering that the General Assembly, in yet another title of the Revised Code, has enacted the so-called "slayer" statute, which prohibits any person in Clay's situation from receiving any "benefit" that results from the probate of a victim's estate. *See* R.C 2105.19. Moreover, there may be compelling policy arguments against providing the full and complete coroner's record relating to a child whom the requesting parent has been convicted of murdering. Thus, while I believe this result is mandated by the specific wording of the text of the statute, I

invite the General Assembly, if it so wishes, to consider whether R.C. 313.10(C)(1) should be made subject to limits similar to those provided by R.C. 149.43(B)(8) or 2105.19.

O'DONNELL, J., concurs in the foregoing opinion to the extent that it encourages the General Assembly to address the issue.

_____

**O'Connor, C.J., dissenting.**

{¶ 48} The lead opinion misconstrues this court's absurd-result jurisprudence. Contrary to the lead opinion's view that the absurd-result exception applies only when the plain language of a single statute yields an unreasonable or absurd result, we have long held that we may consider the legislature's intent when the plain meanings of two statutes, considered together, lead to absurd consequences. I therefore must dissent.

{¶ 49} In 1853, we held that "where, out of several acts touching the same subject matter, there arise collaterally any absurd consequences, manifestly contradictory to common reason, the obvious intention of the law must prevail over a literal interpretation." *Slater v. Cave*, 3 Ohio St. 80, 83 (1853). Indeed, "it is even said, that provisions leading to collateral consequences of great absurdity or injustice, may be rejected as absolutely void." *Id.*

{¶ 50} Nearly 90 years later, the Supreme Court of the United States hailed the power of the courts to interpret statutes not based just on their plain meanings but also their purposes:

> There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. * * * When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however,

even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' [*Ozawa v. United States*, 260 U.S. 178, 194, 43 S.Ct. 65, 67 L.Ed. 199 (1922)] this Court has followed that purpose, rather than the literal words. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, [*Boston Sand & Gravel Co. v. United States*, 278 U.S. 41, 48, 49 S.Ct. 52, 73 L.Ed. 170 (1928)] however clear the words may appear on 'superficial [inspection].' [*Helvering v. New York Trust Co.*, 292 U.S. 455, 54 S.Ct. 806, 78 L.Ed. 1361 (1934).] The interpretation of the meaning of statutes, as applied to justiciable controversies, is exclusively a judicial function. This duty requires one body of public servants, the judges, to construe the meaning of what another body, the legislators, has said. Obviously there is danger that the courts' conclusion as to legislative purpose will be unconsciously influenced by the judges' own views or by factors not considered by the enacting body. A lively appreciation of the danger is the best assurance of escape from its threat but hardly justifies an acceptance of a literal interpretation dogma which withholds from the courts available information for reaching a correct conclusion.

(Some citations omitted.) *United States v. Am. Trucking Assns.*, 310 U.S. 534, 543-544, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); *see also Lawson v. FMR, L.L.C.*, ___ U.S. ___, 134 S.Ct. 1158, 1183, 188 L.Ed.2d 158 (2014) (Sotomayor, J., dissenting) ("the majority's reading runs afoul of the precept that 'interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available' "), quoting *Griffin v. Oceanic*

*Contrs., Inc.*, 458 U.S. 564, 575, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982); *Pub. Citizen v. United States Dept. of Justice*, 491 U.S. 440, 454, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (court can look beyond statutory language when plain meaning would " 'compel an odd result' "), quoting *Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 509, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989); *accord State ex rel. Belford v. Hueston*, 44 Ohio St. 1, 5, 4 N.E. 471 (1886) ("We are, if we can, to ascertain what the legislature intended by its use in this law.  For, 'while the popular or received import of words furnishes a general rule for the interpretation of statutes, they must be interpreted according to the intent and meaning, and not always according to the letter; and where the intent can be discovered, it should be followed, though such construction seems contrary to the letter of the statute' "), quoting an unidentified source.

{¶ 51} This concept remains alive and well in our jurisprudence.  Just two years ago, this court, including some of the justices who join the lead opinion today, found in *State v. White* that the application of an unambiguous criminal-enhancement statute to a law-enforcement officer was "neither just nor reasonable" given other statutes relating to the duties of law-enforcement officers.  142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 32-33.  In *White*, a police officer was charged with one count of felonious assault, with a firearm specification pursuant to R.C. 2941.145, for an on-duty shooting that paralyzed a fleeing suspect.  *Id.* at ¶ 6, 8-9.

{¶ 52} In *White*, we reiterated that " '[o]ur role, in the exercise of the judicial power granted to us by the Constitution, is to interpret the law that the General Assembly enacts, and the primary goal in construing a statute is to ascertain and give effect to the intent of the legislature.' "  *Id.* at ¶ 29, quoting *State v. Taylor*, 138 Ohio St.3d 194, 2014-Ohio-460, 5 N.E.3d 614, ¶ 14.  In doing so, we presume that the legislature intended a just and reasonable result by enacting a statute.  *Id.*, citing R.C. 1.47(C).  Therefore, " 'statutes will be construed to avoid unreasonable

or absurd consequences.' " *Id.*, quoting *State v. Wells*, 91 Ohio St.3d 32, 34, 740 N.E.2d 1097 (2001).

**{¶ 53}** In *White*, we did not find that R.C. 2941.145 was ambiguous. But we considered three seemingly unrelated laws, concerning sentencing enhancements for possessing a firearm, the arrest and detention of suspects, and dereliction of duty, respectively: (1) R.C. 2941.145(A), which imposes additional prison time on an offender who "had a firearm * * * while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense," (2) R.C. 2935.03(A)(1), which requires peace officers to "arrest and detain, until a warrant can be obtained, a person found violating * * * a law of this state," and (3) R.C. 2921.44(A)(2), which makes it a misdemeanor for an officer to negligently "[f]ail to prevent or halt the commission of an offense or to apprehend an offender, when it is in the law enforcement officer's power to do so."

**{¶ 54}** Considering these laws together, we wisely concluded that it would not be just or reasonable to apply R.C. 2941.145(A) to a law enforcement officer:

> Given the need for hurried judgments without the chance for reflection, and given the extensive training that causes officers to act reflexively when encountering potentially dangerous situations, it is neither just nor reasonable to apply a firearm specification to a police officer involved in an on-duty shooting based only on a showing of poor judgment or negligence in using force.

*White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, at ¶ 33. We concluded, "[T]he General Assembly did not intend the firearm specification to apply to a police officer who fired a gun issued to him to protect himself * * * from a person he thought was about to brandish a weapon." *Id.* at ¶ 34.

20

**{¶ 55}** Although the lead opinion claims that in *White*, we referred to the three statutes "merely to bolster" the conclusion that the firearm-specification law was " 'not intended to deter a peace officer from possessing a firearm,' " lead opinion at ¶ 28, quoting *White* at ¶ 31, that is not the case. We reviewed R.C. 2935.03(A)(1) and 2921.44(A)(2) to described the duties of police officers. And indeed, we found that it was those duties that made application of the firearm specification to police officers untenable: "[I]n contrast to those who freely choose to use a firearm while committing a crime * * * the officer is *required* to carry a firearm and permitted to use it, when necessary, in the course of carrying out the duties of a law enforcement officer." (Emphasis sic.) *White* at ¶ 31. In fact, we found that "[t]he firearm specification may apply if the facts of a given case demonstrate that the actions of the officer display criminal misconduct constituting a departure from the course and scope of official duties * * *." *Id.* at ¶ 35. Therefore, it was exactly the duties set forth in R.C. 2935.03(A)(1) and 2921.44(A)(2) that made application of the firearms specification to police officers absurd and unreasonable.

**{¶ 56}** Thus, consistent with more than a century of precedent, courts may properly consider, without first finding that statutory language is ambiguous, whether the literal interpretation of a statute leads to an absurd or unreasonable result based on its plain language, the interplay of related statutes, and the General Assembly's intent.

**{¶ 57}** As with the statute at issue in *White*, we cannot give effect to the legislative intent behind R.C. 313.10(C)(1) by reading it in isolation. The lead opinion's application of R.C. 313.10(C)(1) without addressing its relation to R.C. 149.43(B)(8) unquestionably leads to a result that is plainly at odds with the legislative purpose of the statutes. Indeed, the medical examiner could not have applied the statute in the same isolated way the lead opinion does, because both

R.C. 313.10(C)(1) and 149.43(B)(8) instruct the medical examiner how to handle records requests.

**{¶ 58}** R.C. 313.10 unambiguously exempts certain information in the coroner's possession from public disclosure, including preliminary autopsy and investigative notes, photographs of a decedent, suicide notes, medical and psychiatric records, confidential law-enforcement investigatory records, and laboratory reports. R.C. 313.10(A)(2). However, the statute also provides that the coroner "shall provide a copy of the full and complete records of the coroner with respect to a decedent to a person who makes a written request as the next of kin of the decedent." R.C. 313.10(C)(1). As the lead opinion recognizes, a full and complete copy of the coroner's records would include nonpublic records. Lead opinion at ¶ 31. But the decedent's surviving relatives do not have unlimited access to such items. The surviving spouse of the decedent first holds the right to request the records. R.C. 313.10(C)(1). If a surviving spouse dies without requesting the full and complete records, then that right passes to the children of the decedent, then to the parents, then to brothers and sisters. *Id.* If no kin survive to make a request, or if they all die without making one, then the representative of the decedent's estate may request the records. R.C. 313.10(C)(2).

**{¶ 59}** But R.C. 313.10 is not the only statute that instructs a coroner how to handle records requests. We must consider related laws that impact the duty of public officials to protect or disclose office records. R.C. 149.43(B)(8)—which, like R.C. 313.10, regulates the disclosure of records from public offices—absolves public offices from any duty to "permit a person who is incarcerated pursuant to a criminal conviction or a juvenile adjudication to inspect or to obtain a copy of any public record concerning a criminal investigation or prosecution" unless the request "is for the purpose of acquiring information that is subject to release as a public record under this section and the judge who imposed the sentence or made the

22

adjudication with respect to the person * * * finds that the information sought * * * is necessary to support what appears to be a justiciable claim of the person."[1]

{¶ 60} R.C. 313.10(C)(2) and 149.43(B)(8) touch the same subject matter: the availability of public-office records. If we apply both of them literally, as the lead opinion determines that we should, the result is inescapably absurd. Although R.C. 313.10(C)(1) entitles appellee, Michael Clay, to receive "a copy of the full and complete records of the coroner" related to his daughter, R.C. 149.43(B)(8) states that the coroner (in this case, appellant, the Cuyahoga County Medical Examiner's Office) is not required to provide him "a copy of any public record concerning a criminal investigation or prosecution," absent judicial approval of the request. Because the bulk of the autopsy file in this case is likely a public record pursuant to R.C. 313.10(A)(1) and the medical examiner need not provide public records to Clay pursuant to R.C. 149.43(B)(8), Clay would receive only a small subset of the medical examiner's records: specifically, those records described in R.C. 313.10(A)(2), which the coroner may disclose only in limited circumstances to next of kin, journalists, and insurers, R.C. 313.10(C) through (E). These records would include preliminary autopsy and investigative notes, photographs of the decedent, suicide notes, medical and psychiatric records of the decedent, any confidential law-enforcement investigatory records, and laboratory reports that are discoverable under Crim.R. 16. The result is that although Clay cannot obtain a

---

[1] To be clear, R.C. 149.43(B)(8) does not act as a complete bar to an incarcerated defendant ever accessing public records related to a criminal investigation or prosecution. The statute provides that an incarcerated person may obtain such records if "the judge who imposed the sentence or made the adjudication with respect to the person, or the judge's successor in office, finds that the information sought in the public record is necessary to support what appears to be a justiciable claim of the person." R.C. 149.43(B)(8). And in all likelihood, appellee, Michael Clay, already had access to the entire autopsy file pursuant to Crim.R. 16, which provides that "the prosecuting attorney shall provide copies or photographs" of items that "are material to the preparation of a defense, or are intended for use by the prosecuting attorney as evidence at trial." Crim.R. 16(B). Indeed, in his complaint to the Eighth District in this case, Clay stated that, "the autopsy photos were presented in the trial case."

copy of the autopsy report, he can obtain photos of the dead body of the daughter he murdered.

{¶ 61} Thus, the lead opinion's application of R.C. 313.10(C)(1) is at odds with R.C. 149.43(B)(8), which the General Assembly clearly intended to restrict prisoners' access to records maintained by public officials that are related to criminal investigations or prosecutions.

{¶ 62} But even if the lead opinion chooses to disregard more than a century of case law and hold tight to the notion that we do not have the authority to consider R.C. 149.43, we should still deny the writ of mandamus because the lead opinion's application of R.C. 313.10(C)(1), without respect to any other laws, upends the just and reasonable result that we must presume the General Assembly intended when it enacted that statute.

{¶ 63} The lead opinion makes a conclusory statement, with no analysis, that "the plain language of R.C. 313.10 does not lead to an absurd result in this case." Lead opinion at ¶ 27. But the lead opinion's application of the law is contrary to the obvious intention of R.C. 313.10(C)(1), if not its literal terms. Indeed, before the legislature passed the bill that enacted R.C. 313.10(C)(1), House and Senate committees heard testimony about the importance of protecting the privacy of the families of deceased persons who do not wish for the autopsy photos of their loved ones to be made public. By murdering his daughter, Clay established that he has no regard for any of her interests or the interests of her other family members, least of all their privacy. He should not receive the benefit of a law designed to protect vulnerable families by keeping sensitive information, including suicide notes and autopsy photos, out of the public record.

{¶ 64} The United States Supreme Court has, in fact, recognized that murderers are in a position to exploit these types of records. In a case involving a Freedom of Information Act ("FOIA") request for death-scene photographs of Vince Foster Jr., a deputy counsel to President Clinton who committed suicide, the

court recognized the surviving family members' right to privacy with respect to the images, reasoning,

> We are advised by the Government that child molesters, rapists, murderers, and other violent criminals often make FOIA requests for autopsies, photographs, and records of their deceased victims. Our holding ensures that the privacy interests of surviving family members would allow the Government to deny these gruesome requests in appropriate cases. We find it inconceivable that Congress could have intended a definition of "personal privacy" so narrow that it would allow convicted felons to obtain these materials without limitations at the expense of surviving family members' personal privacy.

*Natl. Archives & Records Admin. v. Favish*, 541 U.S. 157, 170, 124 S.Ct. 1570, 158 L.Ed.2d 319 (2004). Similarly, in seeking to protect the privacy of victims' families under R.C. 313.10, the General Assembly could not have intended to provide a little girl's convicted murderer access to her autopsy photos, simply because that man was her father.

**{¶ 65}** Notwithstanding that it is absurd and unreasonable to permit Clay to obtain autopsy information pursuant to R.C. 313.10, the lead opinion argues that we must, because R.C. 313.10(C) is more specific and was enacted later than R.C. 149.43(B)(8). That is a red herring. These two statutes do not conflict. Rather, they apply to the provision of records to two generally separate classes of people: next of kin of deceased individuals and incarcerated criminals. The fact that in very limited instances these two classes intersect creates absurdity—but not conflict.

**{¶ 66}** If we were to recognize these laws as conflicting, we would have to recognize conflicts between a substantial number of laws creating collateral

consequences for convictions and incarceration. For instance, R.C. 2105.06 provides a detailed scheme for the distribution of property when a person dies intestate, similar to the scheme in R.C. 313.10 for a decedent's next of kin to obtain an autopsy report. But R.C. 2105.19 upends the intestate-distribution scheme by providing that no individual convicted of murder "shall in any way benefit by the death" and "[a]ll property of the decedent * * * shall pass or be paid or distributed as if the person who caused the death of the decedent had predeceased the decedent." R.C. 2105.19(A). These laws are not in conflict. R.C. 2105.19 creates a class of people who cannot benefit from R.C. 2105.06.

{¶ 67} Likewise, Ohio law provides that every United States citizen who is 18 years old and meets certain residency and registration requirements "has the qualifications of an elector." R.C. 3503.01(A)(1). But another law provides that an individual who is found guilty of committing a felony "is incompetent to be an elector." R.C. 2961.01. According to the lead opinion's logic, these laws are in conflict because an individual could be qualified to be an elector pursuant to Ohio's election law but incompetent to be an elector under our criminal law. But these laws do not conflict. One is generally applicable to U.S. citizens over the age of 18 and the other to convicted felons.

{¶ 68} Similarly, the Ohio Constitution enshrines the right of the people to bear arms, without restriction. Ohio Constitution, Article I, Section 4. However, a statute makes it a crime for an individual convicted of a felony offense of violence to carry a firearm. R.C. 2923.13(A)(2). Again, these laws do not conflict as the lead opinion's logic would dictate; they merely create separate classes, one of "the people" and the other of individuals convicted of felonies of violence.

{¶ 69} Like the statutes here governing coroners' reports and restricting the disclosure of public records to incarcerated individuals, there is no legislatively created conflict in these examples. The laws create classes of individuals. Just as an individual in line for an inheritance will receive nothing if that person murdered

the decedent, an imprisoned felon who meets all the statutory requirements to vote nevertheless does not have that privilege, and a convicted felon who meets all the constitutional requirements to bear arms does not retain that right, here, even though Clay meets all the requirements of a next of kin as described by R.C. 313.10, the General Assembly has passed a law that prohibits him from the privilege of viewing the public records in his daughter's autopsy file.

{¶ 70} Indeed, if the lead opinion's logic were applied to all of R.C. 313.10, then there likely would be no restriction on inmates obtaining public records from a coroner at all. The lead opinion notes that when two laws conflict, a specific law enacted later in time generally prevails. Lead opinion at ¶ 31. R.C. 313.10(B) provides that "[a]ll records in the coroner's office that are public records are open to inspection by the public, and any person may receive a copy of any such record or part of it upon demand in writing." To the extent that R.C. 149.43(B)(8) conflicts with R.C. 313.10(C)(1) by limiting the access of an incarcerated next of kin to public records, as the lead opinion maintains, then R.C. 149.43(B)(8) also conflicts with R.C. 313.10(B), which specifically permits "any person" to obtain a public record from a coroner without regard to the person's incarceration status.

{¶ 71} R.C. 313.10 was enacted later in time and, according to the lead opinion, is the more specific statute because it "specifically applies to records kept by the coroner." Lead opinion at ¶ 30. Therefore, the lead opinion's logic would dictate that R.C. 313.10(B) prevails in any conflict with R.C. 149.43(B)(8) and that incarcerated criminals, as members of the public, may access public records of the coroner relating to their prosecutions. This circumstance squarely demonstrates why it is inequitable to select, as the lead opinion has done, a single law to govern a situation when multiple laws actually apply.

{¶ 72} The lead opinion's decision will not only subvert the General Assembly's intent here, it will set a calamitous precedent. An inmate imprisoned for murdering a spouse, parent, or sibling is still a convicted murderer, yet

according to the lead opinion, the incarcerated murderer may be entitled to the victim's autopsy records and photos. Ignoring R.C. 149.43(B)(8)'s prohibition on an inmate's access to public records related to a criminal investigation or prosecution—merely because the inmate murdered a family member—does nothing to advance the goals of the General Assembly, including protecting the privacy and dignity of the victim and the victim's family.

{¶ 73} The lead opinion here, with its strict adherence to a literal-interpretation dogma, implies that we would usurp the legislature's role if we applied the plain language of a statute rationally and in concert with the General Assembly's intent. Using the lead opinion's guidance, a statutorily identified relative is entitled to the autopsy records, period. And no other statute need be consulted on the matter, even if the relative is a murderer guilty of matricide, patricide, fratricide, or filicide. I disagree. This case calls for us to apply two relevant laws to one murderer, which does not require us to add words to a statute or to ignore statutory provisions altogether. This case began with a murderer's request for his victim's autopsy records. Pursuant to R.C. 149.43(B)(8), that fact alone should prevent Clay from taking advantage of R.C. 313.10(C)(1), a law meant to protect the very people he harmed.

{¶ 74} I dissent.

FRENCH and O'NEILL, JJ., concur in the foregoing opinion.

_____

Michael Clay, pro se.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kelly Kay Perk, Assistant Prosecuting Attorney, for appellant.

Barnes & Thornburg, L.L.P., and C. David Paragas, urging reversal for amicus curiae, Ohio State Coroners Association.

_____