[Cite as *Amalgamated Transit Union, AFL-CIO, Local 697 v. Toledo Area Regional Transit Auth.*, 2020-Ohio-6655.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Amalgamated Transit Union,
AFL-CIO, Local 697

        Appellee

v.

Toledo Area Regional Transit
Authority

        Appellant

Court of Appeals No. L-19-1197

Trial Court No. CI0201106508

**<u>DECISION AND JUDGMENT</u>**

Decided:  December 11, 2020

* * * * *

Joseph S. Pass, for appellee.

Joseph C. Devine and Ryan A. Cates, for appellant.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal from a judgment of the Lucas County Court of Common Pleas in favor of appellee after a bench trial. For the reasons set forth below, this court reverses the judgment of the trial court.

**{¶ 2}** This is the ninth year of litigation of this matter and the third appeal to emanate from that litigation. On November 14, 2011, plaintiff-appellee Amalgamated Transit Union, AFL-CIO, Local 697 ("ATU") filed an "Application/Petition to Compel Enforcement of Arbitration Agreement" against defendant-appellant Toledo Area Regional Transit Authority ("TARTA") after the 2009 collective bargaining agreement ("CBA") between the parties expired, and they could not agree on a successor CBA. In the first appeal, this court reversed the trial court's order dismissing ATU's petition for lack of subject-matter jurisdiction. *Amalgamated Transit Union, AFL-CIO, Local 697 v. Toledo Area Regional Transit Auth.*, 2013-Ohio-4412, 2 N.E.3d 289 (6th Dist.). In the second appeal, this court vacated the trial court's July 31, 2017 bench trial judgment granting ATU's petition and remanded for separate findings of fact and conclusions of law. *Amalgamated Transit Union, AFL-CIO, Local 697 v. Toledo Area Regional Transit Auth.*, 6th Dist. Lucas No. L-17-1217, 2018-Ohio-2867. This third appeal responds to the trial court's August 9, 2019 journalized "Opinion and Judgment Entry on Remand Bench Trial Findings of Fact and Conclusions of Law," again granting ATU's petition.[1]

---

[1] We note that the trial court declined to restate the background information from its now-vacated prior judgment, and "incorporated" that background information into its new judgment. However, since a judgment vacated on appeal is of no further force and effect, the incorporation-by-reference by the trial court failed and is not part of the new judgment entry. App.R. 12; *compare Harrison v. Harrison*, 10th Dist. Franklin No. 01AP-93, 2001 WL 838991, *4 (July 26, 2001) (trial court generally may incorporate by reference its own decision into a judgment entry).

2.

{¶ 3} TARTA timely filed this notice of appeal setting forth three assignments of error.

I. The trial court erred as a matter of law in granting judgment in favor of ATU and ordering the parties to binding interest arbitration over the terms and conditions of a successor, public-sector collective bargaining agreement ("CBA"), because the parties did not agree to submit the terms and conditions of a successor CBA to binding interest arbitration.

II. The trial court erred as a matter of law in finding that Ohio courts favor binding interest arbitration to resolve an impasse in negotiations for a successor, public-sector CBA between a public employer and a union.

III. The trial court erred because its August 8, 2019 Opinion and Judgment Entry is contrary to the law of the case and against the manifest weight of the evidence.

## I. Ohio Arbitration Public Policy

{¶ 4} We will address TARTA's second assignment of error first.

{¶ 5} TARTA argues for its second assignment of error that the trial court erred as a matter of law in finding that Ohio courts favor binding interest arbitration, rather than fact-finding, to resolve an impasse for a successor, public-sector CBA. TARTA further argues Ohio's public policy stated in R.C. 4117.14 favors fact-finding for an impasse for a successor CBA between a public employer and a non-safety forces union. One exception is where there is a clear and unambiguous mutually agreed upon dispute

3.

settlement procedure (a "MAD"), and TARTA argues the limited-purpose protective arrangements agreement under the Urban Mass Transportation Act of 1964, as amended ("UMTA"), sometimes called a "Section 13(c) Agreement," is not a MAD.

{¶ 6} In response, ATU argues its petition to compel arbitration against TARTA was brought pursuant to R.C. 2711.03. ATU argues R.C. 2711.01(A) is clear that when the parties agree to settle a controversy between them by arbitration, that agreement is "valid, irrevocable, and enforceable, except upon grounds that exist at law or in equity for the revocation of any contract." ATU argues the Section 13(c) Agreement with TARTA is a valid, irrevocable and enforceable agreement to arbitrate the impasse between the parties for a successor, public-sector CBA.

{¶ 7} "R.C. Chapter 2711 is Ohio's Arbitration Act [enacted in 1953]. The act predates enactment [in 1984] of the Public Employees' Collective Bargaining Act (R.C. Chapter 4117)." *Toledo Police Command Officers' Assn. v. Toledo*, 2014-Ohio-4119, 20 N.E.3d 308, ¶ 28 (6th Dist.). According to the Ohio Supreme Court, the Ohio Arbitration Act tracks the language of the Federal Arbitration Act, enacted in 1925, in expressing a strong public policy favoring arbitration. *Taylor v. Ernst & Young, L.L.P.*, 130 Ohio St.3d 411, 2011-Ohio-5262, 958 N.E.2d 1203, ¶ 18. However, such public policy favoring arbitration is not absolute because parties are not required to arbitrate when they have not agreed to do so. *Id.* at ¶ 19. "Accordingly, when deciding motions to compel arbitration, the proper focus is whether the parties actually agreed to arbitrate the

4.

issue, i.e., the scope of the arbitration clause, not the general policies of the arbitration statutes." *Id.* at ¶ 20.

{¶ 8} In its August 9, 2019 journalized judgment entry, the trial court stated it was "guided by the prevalent legal principle in Ohio that courts favor arbitration," citing to four state court cases from Ohio, but none involved an expired CBA between a public employer and an exclusive representative and their impasse to negotiating a successor CBA pursuant to R.C. 4117.14.

## A. R.C. 2711.01 and 4117.14

{¶ 9} We next review the state statutes raised by the parties in this appeal. "A question of statutory construction presents an issue of law that we determine de novo on appeal." *Lang v. Dir., Ohio Dept. of Job & Family Servs.*, 134 Ohio St.3d 296, 2012-Ohio-5366, 982 N.E.2d 636, ¶ 12.

{¶ 10} R.C. 2711.01(A) states:

A provision in any written contract, except as provided in division (B) of this section, to settle by arbitration a controversy that subsequently arises out of the contract, or out of the refusal to perform the whole or any part of the contract, or any agreement in writing between two or more persons to submit to arbitration any controversy existing between them at the time of the agreement to submit, or arising after the agreement to submit, from a relationship then existing between them or that they simultaneously create, shall be valid, irrevocable, and enforceable, except

5.

upon grounds that exist at law or in equity for the revocation of any contract.

{¶ 11} It is undisputed that the exceptions found in R.C. 2711.01(B) do not apply in this matter.

{¶ 12} The MAD authorization referenced by the parties is found at R.C. 4117.14(C), and the relevant portions of R.C. 4117.14, for context, state:

(A) The procedures contained in this section govern the settlement of disputes between an exclusive representative and a public employer concerning the * * * negotiation of a successor agreement * * *.

* * *

(C) In the event the parties are unable to reach an agreement, they may submit, at any time prior to forty-five days before the expiration date of the collective bargaining agreement, the issues in dispute to any mutually agreed upon dispute settlement procedure which supersedes the procedures contained in this section.

(1) The procedures may include:

(a) Conventional arbitration of all unsettled issues;

(b) Arbitration confined to a choice between the last offer of each party to the agreement as a single package;

(c) Arbitration confined to a choice of the last offer of each party to the agreement on each issue submitted;

(d) The procedures described in division (C)(1)(a), (b), or (c) of this section and including among the choices for the arbitrator, the recommendations of the fact finder, if there are recommendations, either as a single package or on each issue submitted;

(e) Settlement by a citizens' conciliation council composed of three residents within the jurisdiction of the public employer. * * *.

(f) Any other dispute settlement procedure mutually agreed to by the parties.

(2) If, fifty days before the expiration date of the collective bargaining agreement, the parties are unable to reach an agreement, any party may request the state employment relations board to intervene. * * * If an impasse exists or forty-five days before the expiration date of the collective bargaining agreement if one exists, the board shall appoint a mediator to assist the parties in the collective bargaining process.

(3) Any time after the appointment of a mediator, either party may request the appointment of a fact-finding panel. * * *.

(4) The following guidelines apply to fact-finding: * * *.

(5) The fact-finding panel, acting by a majority of its members, shall transmit its findings of fact and recommendations on the unresolved issues to the public employer and employee organization involved and to the board no later than fourteen days after the appointment of the fact-finding

panel, unless the parties mutually agree to an extension. The parties shall share the cost of the fact-finding panel in a manner agreed to by the parties.

(6)(a) * * * if neither rejects the recommendations, the recommendations shall be deemed agreed upon as the final resolution of the issues submitted and a collective bargaining agreement shall be executed between the parties, including the fact-finding panel's recommendations, except as otherwise modified by the parties by mutual agreement. If either the legislative body or the public employee organization rejects the recommendations, the board shall publicize the findings of fact and recommendations of the fact-finding panel. The board shall adopt rules governing the procedures and methods for public employees to vote on the recommendations of the fact-finding panel.

* * *

(E) Nothing in this section shall be construed to prohibit the parties, at any time, from voluntarily agreeing to submit any or all of the issues in dispute to any other alternative dispute settlement procedure. An agreement or statutory requirement to arbitrate or to settle a dispute pursuant to a final offer settlement procedure and the award issued in accordance with the agreement or statutory requirement is enforceable in the same manner as specified in division (B) of section 4117.09 of the Revised Code.

{¶ 13} We construe a statute to determine the legislative intent, looking to the language used and the purpose to be accomplished. *State ex rel. Herman v. Klopfleisch*, 72 Ohio St.3d 581, 584, 651 N.E.2d 995 (1995). "If the meaning of a statute is unambiguous and definite, then it must be applied as written and no further interpretation is appropriate." *Id.* Interpretations that lead to absurd or obviously unintended results are not consistent with determining legislative intent. *State ex rel. Clay v. Cuyahoga Cty. Med. Examiner's Office*, 152 Ohio St.3d 163, 2017-Ohio-8714, 94 N.E.3d 498, ¶ 22 and 26; R.C. 1.47(C) (statutory presumption for a just and reasonable result is intended).

{¶ 14} We agree with ATU that the language of R.C. 2711.01(A) is clear and unambiguous, and we apply the statute as written. *Johnson v. Montgomery*, 151 Ohio St.3d 75, 2017-Ohio-7445, 86 N.E.3d 279, ¶ 15. We find that a condition precedent to the application of R.C. 2711.01(A) is the existence of a written agreement between the parties to arbitrate the controversy at issue.

{¶ 15} We further find that R.C. 4117.14 specifically applies to the special status of the parties in this matter: a public employer and an exclusive representative. In its complaint, ATU admits that TARTA is a "public employer" pursuant to R.C. 4117.01(B), and ATU is an "employee organization" pursuant to R.C. 4117.01(D) and the "exclusive representative" of TARTA's paratransit employees pursuant to R.C. 4117.01(E). In addition, "The language of R.C. 4117.10(A)[,] which provides that collective bargaining agreements generally prevail over conflicting laws[,] applies equally to contract provisions encompassing mandatory subjects of bargaining and those encompassing

9.

permissive subjects of bargaining." *Cincinnati v. Ohio Council 8, Am. Fedn. of State, Cty. & Mun. Emp., AFL-CIO*, 61 Ohio St.3d 658, 659, 576 N.E.2d 745 (1991), paragraph three of the syllabus.

{¶ 16} We also agree with TARTA that the language of R.C. 4117.14(C) is clear and unambiguous. When a "public employer" and an "exclusive representative" are negotiating a successor CBA, the procedures in R.C. 4117.14 govern. *Fairborn Professional Fire Fighters' Assn., IAFF Local 1235 v. Fairborn*, 90 Ohio St.3d 170, 171, 736 N.E.2d 5 (2000); R.C. 4117.14(A). When those special parties are unable to reach an agreement, "they may submit * * * the issues in dispute to any mutually agreed upon dispute settlement procedure which supersedes the procedures contained in this section." R.C. 4117.14(C). Rather than mandate binding interest arbitration, the legislative intent of the statute clearly states the preference to be whatever MAD exists between the parties for the issues in dispute. Only in the absence of a MAD for the issues in dispute do the numerous optional dispute resolution procedures set forth in the remainder of R.C. 4117.14(C)(1)-(6) apply. Again, rather than mandate binding interest arbitration, the statute clearly concludes that at any time the parties may agree to submit a disputed issue "to any other alternative dispute settlement procedure." R.C. 4117.14(E). Finally, the R.C. 4117.09(B)(1) grievance procedure in a CBA that culminates with final and binding grievance arbitration award may be enforced in a court of common pleas. R.C. 4117.14(E). Thus, the statute clearly permits a "public employer" and an "exclusive representative" to employ a MAD as the impasse procedure to a successor CBA other

10.

than the one set forth in R.C. 4117. However, we find, again, that a condition precedent to the application of a MAD in this matter is the agreement by the parties in the MAD to submit the impasse for a successor, public-sector CBA to interest arbitration.

{¶ 17} We find only two instances where the General Assembly specifically transfers R.C. 4117.14 procedures to R.C. 2711, and both instances are not evident in the record before us: trial court review of final offer settlement awards and orders of the conciliator pursuant to R.C. 4117.14(G)(8) and (H), respectively. *Fairborn* at 171. We further find that for the dispute before us, the impasse in 2011 for a successor, public-sector CBA between ATU and TARTA, the special provisions of R.C. 4117.14(C) prevail as an exception over any conflicting provisions of R.C. 2711.01(A). R.C. 1.51.

### B. Interest Arbitration and Grievance Arbitration

{¶ 18} To further understand how the exceptions operate to Ohio's strong preference for arbitration to resolve disputes, we review the distinction between two types of arbitration invoked in this matter: interest arbitration and grievance arbitration.

{¶ 19} The parties do not dispute that this matter involves a question of interest arbitration, not grievance arbitration, and the trial court made one reference to interest arbitration in its findings of fact: "On September 14, 2011 TARTA confirmed its refusal to proceed to interest arbitration under the parties' Section 13(c) Agreement." *Amalgamated Transit*, 2013-Ohio-4412, 2 N.E.3d 289, at ¶ 33 (Jensen, J., dissenting). In the record before us, the CBA's Article 6 grievance procedure culminates at "Step IV Arbitration," describing the method of resolving the parties' differences concerning the

11.

interpretation, application, or violation of the existing CBA. Consequently, in grievance arbitration the arbitrator is limited to interpreting and applying the relevant CBA provisions to the facts, without amending, modifying, nullifying, ignoring, subtracting from or adding to the provisions of the CBA. *Internatl. Assn. of Firefighters, Local 67 v. Columbus*, 95 Ohio St.3d 101, 103-104, 766 N.E.2d 139 (2002).

{¶ 20} "Interest arbitration, unlike grievance arbitration, focuses on what the terms of a new agreement should be, rather than the meaning of the terms of the old agreement." *Local 58, Intern. Broth. of Elec. Workers, AFL-CIO v. Southeastern Michigan Chapter, Nat. Elec. Contractors Ass'n, Inc.*, 43 F.3d 1026, 1030 (6th Cir.1995). Interest, or impasse, arbitration describes the method, in the context of this matter, of resolving the parties' differences on the terms of a successor CBA itself. *Id.* at 1028, fn. 1. The arbitrator's role in interest arbitration is very different from grievance arbitration because in interest arbitration, the arbitrator selects the terms for the successor CBA. *Id.* at 1030.

{¶ 21} We find that because of the enormous consequences to the parties if their impasse to negotiate a successor CBA were determined by an arbitrator through interest arbitration, an explicit agreement or statutory mandate to do so is necessary to apply the general public policy preference towards resolving disputes by arbitration in this matter. We do not find an explicit mandate for the parties to pursue interest arbitration pursuant to R.C. 4117.14, nor an explicit agreement in the now expired CBA. As will be shown in the next section, we do not interpret the Section 13(c) Agreements in this matter as

12.

containing the explicit agreement by the parties for federal intervention, instead of Ohio law, to bind ATU and TARTA to terms of a successor CBA through interest arbitration.

{¶ 22} Upon de novo review we find TARTA's second assignment of error is well-taken, in part, and not well-taken, in part. The trial court did not err in identifying a strong public policy preference favoring arbitration to resolve disputes, but erred in applying that policy preference to the impasse negotiations for a successor CBA.

## II. Arbitrability

{¶ 23} TARTA argues for its first assignment of error that the trial court erred when it interpreted the Section 13(c) Agreement between the parties to contain an agreement for a federal process of interest arbitration for their impasse for a successor, public-sector CBA.

{¶ 24} In response, ATU argues this court has already interpreted the Section 13(c) Agreements, which cannot be appealed again. We disagree with ATU. Our decision affirming the trial court's jurisdiction did not predetermine the arbitrability of ATU's dispute with TARTA pursuant to the Section 13(c) Agreement. We recognize that the Eight District Court of Appeals recently reached a different conclusion on jurisdiction. *See Amalgamated Transit Union Local 268 v. Greater Cleveland Regional Transit Auth.*, 8th Dist. Cuyahoga No. 108883, 2020-Ohio-3120, ¶ 28.

### A. Standard of Review

{¶ 25} A determination of arbitrability is based on contract interpretation. *Taylor Bldg. Corp. of Am. v. Benfield*, 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12, ¶ 35.

13.

"Contract interpretation is a matter of law, and questions of law are subject to de novo review on appeal." *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 2007-Ohio-5026, 875 N.E.2d 561, ¶ 38.

{¶ 26} "Arbitrability concerns 'whether a[n] * * * agreement creates a duty for the parties to arbitrate the particular [dispute].'" *Toledo Police,* 2014-Ohio-4119, 20 N.E.3d 308, at ¶ 52, quoting *Council of Smaller Ents. v. Gates, McDonald & Co.*, 80 Ohio St.3d 661, 666, 687 N.E.2d 1352 (1998). "Arbitrability of a specific [dispute] is, in the absence of an agreement to submit the issue to an arbitrator, a question for a court to decide." *Toledo Police Patrolman's Assn., Local 10, IUPA, AFL-CIO-CLC v. Toledo*, 127 Ohio App.3d 450, 458, 713 N.E.2d 78 (6th Dist.1998).

{¶ 27} "We have consistently explained that parties may contract for the terms they want and that the 'intent of the parties is presumed to reside in the language they chose to use in their agreement.'" *Hope Academy Broadway Campus v. White Hat Mgt., L.L.C.*, 145 Ohio St.3d 29, 2015-Ohio-3716, 46 N.E.3d 665, ¶ 35, quoting *Graham v. Drydock Coal Co.,* 76 Ohio St.3d 311, 313, 667 N.E.2d 949 (1996). "Common words in a contract are given their plain and ordinary meaning, unless another meaning is clearly evident from the face or overall content of the contract, or unless the result is manifestly absurd." *Id.* at ¶ 36.

{¶ 28} "As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11. "Courts apply clear and unambiguous contract provisions without

14.

regard to the relative advantages gained or hardships suffered by the parties." *Hope Academy* at ¶ 36. "A contract 'does not become ambiguous by reason of the fact that in its operation it will work a hardship upon one of the parties thereto.'" *Id.* at ¶ 37, quoting *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.,* 78 Ohio St.3d 353, 362, 678 N.E.2d 519 (1997).

{¶ 29} Ohio has adopted four rules for reviewing decisions concerning a dispute's arbitrability: (1) arbitration is a matter of contract, and a party is not required to submit a dispute to arbitration which the party has not agreed to so submit; (2) whether a particular dispute is arbitrable is a question of law for the court to decide; (3) when deciding whether the parties agreed to submit a particular dispute to arbitration, a court may not rule on the potential merits of the underlying claim; and (4) an arbitration clause in an agreement creates a presumption of arbitrability unless there is positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. *Academy of Medicine of Cincinnati v. Aetna Health, Inc.*, 108 Ohio St.3d 185, 2006-Ohio-657, 842 N.E.2d 488, ¶ 5.

{¶ 30} Ohio has also adopted the *Fazio* test of arbitrability: "'if an action could be maintained without reference to the contract or relationship at issue. If it could, it is likely outside the scope of the arbitration agreement.'" *Id.* at ¶ 6, quoting *Fazio v. Lehman Bros.*, 340 F.3d 386, 395 (6th Cir.2003). "We find that the *Fazio* test is consistent with Ohio law and is not contrary to federal law on the issue of arbitrability." *Id.* at ¶ 30. The *Fazio* test "also establishes that the existence of a contract between the

parties does not mean that every dispute between the parties is arbitrable." *Id.* at ¶ 29. This court has held that even though Ohio favors arbitration, not every arbitration clause is enforceable. *Davidson v. Robertson Orchards, Inc.*, 6th Dist. Huron No. H-99-020, 2000 WL 376407, *1 (Apr. 14, 2000).

## B. Findings of Fact and Conclusions of Law

{¶ 31} The trial court adopted as findings of fact to support its decision journalized on August 9, 2019, 20 out of 39 proposed findings of fact submitted by ATU, and none of the 99 proposed findings of fact submitted by TARTA.

{¶ 32} Both TARTA and ATU err for part of TARTA's third assignment of error that our review of the trial court's findings of fact is for the manifest weight of the evidence. Rather, where a matter "presents mixed issues of law and fact, an appellate court should review the [trial] court's findings of fact for abuse of discretion and review its conclusions of law de novo." *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶ 1. On appeal we give appropriate deference to the trial court's findings of fact. *Taylor Bldg.*, 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12, at ¶ 2.

{¶ 33} We find that the trial court did not abuse its discretion when it stated its findings of fact by adopting 20 proposed findings of fact submitted by ATU.

{¶ 34} However, upon de novo review we find the trial court erred when it applied those findings of facts to the law to reach the following legal conclusions:

> It is further undisputed that federal funding is used to pay wages and benefits of ATU members. While such federal funding, and its allocation,

may not be the sole reason for the labor dispute between ATU and TARTA, the Court finds that such dispute is sufficiently related to the federal funding received by TARTA to submit this matter to interest arbitration under the parties' Section 13(c) Agreement.  As the Court noted previously, the facts of this case present it with an exceptionally close call.  However, the Court is guided by the prevalent legal principle in Ohio that court's favor arbitration. * * * As such, when the Court takes everything into consideration after trial, it finds in favor of [ATU].

### C.  Purpose of Section 13(c) Agreements

{¶ 35} Section 13(c) of UMTA in effect in 1975 was the same when the United States Supreme Court extensively evaluated the statute in 1982.  Section 13(c) stated:

"It shall be a condition of any assistance under section 3 of this Act that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance. Such protective arrangements shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise; (2) the continuation of collective bargaining rights; (3) the protection of individual employees against a worsening of their positions with respect to their employment; (4) assurances of employment to employees of acquired

mass transportation systems and priority of reemployment of employees terminated or laid off; and (5) paid training or retraining programs. Such arrangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to section 5(2)(f) of the Act of February 4, 1887 (24 Stat. 379), as amended. The contract for the granting of any such assistance shall specify the terms and conditions of the protective arrangements."

*Jackson Transit Auth. v. Local Div. 1285, Amalgamated Transit Union, AFL-CIO-CLC*, 457 U.S. 15, 18, 102 S.Ct. 2202, 72 L.Ed.2d 639 (1982), fn2, quoting 49 U.S.C. 1609(c).[2]

{¶ 36} The United States Supreme Court reviewed the legislative history of UMTA and conclusively determined that Congress enacted section 13(c) of UMTA to "prevent federal funds from being used to destroy the collective-bargaining rights of organized workers." *Id.* at 16. "A consistent theme runs throughout the consideration of § 13(c): Congress intended that labor relations between transit workers and local governments would be controlled by state law." *Id.* at 24. This conclusion in favor of state law govern the labor relations was reached because, despite language leaning towards federal intervention, "Congress made it absolutely clear that it did not intend to

---

[2] Pub.L. No. 88-365, § 10(c), 78 Stat. 302, 307, redesignated as Section 13(c) by Pub.L. No. 89-562, § 2, 80 Stat. 715, 716, as amended, now codified at 49 U.S.C. 5333(b) (2006). *Dallas Area Rapid Transit v. Amalgamated Transit Union Local No. 1338*, 273 S.W.3d 659, 660 (Tex.2008), fn. 1.

18.

create a body of federal law applicable to labor relations between local governmental entities and transit workers." *Id.* at 27. "Although there were some indications that the UMTA made '§ 13(c) agreements and collective-bargaining contracts creatures of federal law,' countervailing considerations -- primarily a longstanding National Labor Relations Act exemption for labor relations between local governments and their employees -- demonstrated a congressional intent to the contrary." *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 679, 126 S.Ct. 2121, 165 L.Ed.2d 131 (2006), quoting *Jackson Transit* at 23.

{¶ 37} We find the United States Supreme Court gives us clear guidance in this matter:

> Section 13(c) would not supersede state law, it would leave intact the exclusion of local government employers from the National Labor Relations Act, and state courts would retain jurisdiction to determine the application of state policy to local government transit labor relations. Congress intended that § 13(c) would be an important tool to protect the collective-bargaining rights of transit workers, by ensuring that state law preserved their rights before federal aid could be used to convert private companies into public entities. But Congress designed § 13(c) as a means to accommodate state law to collective bargaining, not as a means to substitute a federal law of collective bargaining for state labor law. (Citations omitted.)

Given this explicit legislative history, we cannot read § 13(c) to create federal causes of action for breaches of § 13(c) agreements and collective-bargaining contracts between UMTA aid recipients and transit unions. The legislative history indicates that Congress intended those contracts to be governed by state law applied in state courts.

*Jackson Transit* at 27-29. This court previously recognized Congress' intent. *Amalgamated Transit*, 2013-Ohio-4412, 2 N.E.3d 289, at ¶ 24.

{¶ 38} "Congress has consistently declined to interfere with free collective bargaining and has preferred that device, or voluntary arbitration, to the imposition of compulsory terms as a means of avoiding or terminating labor disputes." *N. L. R. B. v. Burns Intern. Sec. Services, Inc.*, 406 U.S. 272, 282, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). Section 13(c) has frequently been interpreted as merely protecting the collective bargaining process, rather than dictate the terms of a CBA. *Finocchi v. Greater Cleveland Regional Transit Auth.*, 85 Ohio App.3d 572, 578, 620 N.E.2d 872 (8th Dist.1993), citing *Amalgamated Transit Union Intern., AFL-CIO v. Donovan*, 767 F.2d 939, 953 (D.C.Cir.1985).

{¶ 39} "[T]here is no indication [Congress'] goal [in section 13(c)] was to freeze the employees' rights indefinitely." *State v. United States Dept. of Labor*, 306 F.Supp.3d 1180, 1187 (E.D.Cal.2018). "UMTA's section 13(c) does not restrict states from adopting any constitutionally permissible public sector collective bargaining law they choose." *Donovan* at 947. The Ohio General Assembly enacted R.C. 4117 in 1984 to

20.

specifically recognize public-sector collective bargaining. It is undisputed in 2009 the parties originally entered into the now-expired CBA, governed by R.C. 4117 and not by section 13(c) of UMTA.

{¶ 40} "Section 13(c) does not prescribe mandatory labor standards for the states, but rather dictates the terms of federal mass transit assistance." *Id.* "Section 13(c) contains no rights-creating language. * * * The statutory language thus focuses on steps the Secretary of Labor must take to ensure that employee protections are in place, but does not create any specific rights itself." *Stenger v. Bi-State Dev. Agency of Missouri/Illinois Metropolitan Dist.*, 808 F.3d 734, 738 (8th Cir.2015). Those conclusions are consistent with the trial court's finding of fact that "Pursuant to Section 13(c) of [UMTA], TARTA must enter into protective arrangements as a precondition to receiving federal funding from the FTA."

### D. Analysis

#### 1. The Agreements To Be Interpreted

{¶ 41} It is undisputed the parties direct us to two agreements between them.

{¶ 42} The trial court made a finding of fact that "TARTA and ATU entered into a Section 13(c) Agreement on July 23, 1975 that applies to TARTA's receipt of federal operating assistance, with Paragraph 9 of the March 4, 1975 Agreement incorporated as an addendum pursuant to Paragraph 4 thereof." The July 23, 1975 Section 13(c) Agreement is also known as the "Operations Funding Agreement," and the March 4,

21.

1975 Section 13(c) Agreement is also known as the "Capital Projects Funding Agreement."

{¶ 43} The trial court also made a finding of fact that "TARTA and ATU entered into an Agreement on March 4, 1975 pursuant to and in compliance with Section 13(c) of [UMTA] that applies to TARTA's receipt of federal financial assistance."

{¶ 44} The parties direct us to paragraph 3 of the Operations Funding Agreement, which states:

> All rights, privileges, and benefits (including pension rights and benefits) of employees covered by this agreement (including employees having already retired) under existing collective bargaining agreements or otherwise, or under any revision or renewal thereof, shall be preserved and continued; provided, however, that such rights, privileges and benefits which are not foreclosed from further bargaining under applicable law or contract may be modified by collective bargaining and agreement by [TARTA] and [ATU] involved to substitute other rights, privileges and benefits. Unless otherwise provided, nothing in this agreement shall be deemed to restrict any rights [TARTA] may otherwise have to direct the working forces and manage its business as it deems best, in accordance with the applicable collective bargaining agreement.

{¶ 45} The parties direct us to paragraph 4 of the Operations Funding Agreement, which states:

22.

The collective bargaining rights of employees covered by this agreement, including the right to arbitrate labor disputes and to maintain union security and check off arrangements, as provided by applicable laws, policies and/or existing collective bargaining agreements, shall be preserved and continued.  * [insert]  Provided, however, that this provision shall not be interpreted so as to require [TARTA] to retain any such rights which exist by virtue of a collective bargaining agreement after such agreement is no longer in effect.

* [insert] As an addendum to this agreement, there shall be attached where applicable the arbitration or other dispute settlement procedures or arrangements provided for in the existing collective bargaining agreements or any other existing agreements between [TARTA] and [ATU], subject to any changes in such arrangements as may be agreed upon or determined by interest arbitration proceedings.

[TARTA] agrees that it will bargain collectively with [ATU] or otherwise arrange for the continuation of collective bargaining, and that it will enter into agreement with [ATU] or arrange for such agreements to be entered into, relative to all subjects which are or may be proper subjects of collective bargaining.  If, at any time, applicable law or contracts permit or grant to employees covered by this agreement the right to utilize any

economic measures, nothing in this agreement shall be deemed to foreclose the exercise of such right.

{¶ 46} The parties agree the asterisk insert in paragraph 4 of the Operations Funding Agreement incorporates by reference paragraph 9 of the Capital Projects Funding Agreement, which states:

In the event of any labor dispute involving [TARTA] and the employees covered by this Agreement which cannot be settled within thirty (30) days after such dispute first arises, such dispute may be submitted at the written request of either [ATU] or [TARTA] to a board of arbitration selected in accordance with the existing collective bargaining agreement, if any, or if none, as hereafter provided. [TARTA] and [ATU] shall each, within ten (10) days, select one member of the arbitration board and the two members thus chosen shall select a third member who shall serve as chairman. Should the two members be unable to agree upon the appointment of the neutral member within ten (10) days, either party may request the American Arbitration Association to furnish a list of five (5) persons from which the neutral member may be selected. The parties shall, within five (5) days after the receipt of such list determine by lot the order of elimination, and thereafter each shall, in that order, alternately eliminate one name until only one name remains. The remaining person on the list shall be the neutral member. The decision by majority vote of the

24.

arbitration board shall be final, binding and conclusive and shall be rendered within forty-five (45) days from the date the neutral member is appointed. Awards made pursuant to said arbitration may in clued full back pay and allowances to employee-claimants. The salaries and expenses of the neutral member shall be borne equally by the parties to the proceedings, and all other expenses shall be paid by the party incurring them. The term "labor dispute" shall be broadly construed and shall include, but not be limited to, any controversy concerning wages, salaries, hours, working conditions or benefits, including health and welfare, sick leave, insurance, or pension and retirement provisions, the making or maintaining of collective bargaining agreements, the terms to be included in such agreements and the interpretation or application of such collective bargaining agreements, and grievances that may arise, and any controversy arising out of or by virtue of any provisions of this Agreement. Nothing in this paragraph, or Agreement, shall be construed to enlarge or limit the right of the employees covered by this Agreement, or their employer, to utilize upon expiration of any collective bargaining agreement or otherwise any economic measures that are not inconsistent or in conflict with the collective bargaining agreement or applicable law.

## 2. Interpreting the Operations Funding Agreement

{¶ 47} The specific dispute in this matter is whether the parties agreed in the 1975 Operations Funding Agreement to submit to binding interest arbitration the impasse in 2011 between the parties to negotiate a successor CBA. It is undisputed in the record that the expired CBA is not the Operations Funding Agreement.

{¶ 48} In order to interpret the Operations Funding Agreement we must determine the intent of the parties in 1975 and the language they employed in that agreement.

{¶ 49} We glean the intent of the parties from the trial court's finding of fact the Operations Funding Agreement "applies to TARTA's receipt of federal operating assistance," and from the preamble clauses of the Operations Funding Agreement: "as a condition of any [UMTA financial] assistance," the Operations Funding Agreement was to facilitate TARTA's receipt of federal operating financial assistance under section 13(c) of UMTA. Facilitating TARTA's receipt of federal funding was in both ATU's and TARTA'S interests, according to the record.

{¶ 50} We begin by applying the *Fazio* test of arbitrability to paragraph 4 of the Operations Funding Agreement, which the parties agree incorporates by reference paragraph 9 of the Capital Projects Funding Agreement. It is immediately apparent that ATU cannot maintain its action to compel arbitration to resolve the impasse with TARTA for a successor CBA under the Operations Funding Agreement alone without reference to the parties' expired CBA or to their labor relationship as the "exclusive representative" and "public employer" to the expired CBA, which, in turn, is governed by R.C. 4117.

26.

When also viewed through Congress' clear intent that state law govern the labor relationship of TARTA and ATU, not section 13(c) of UMTA, it is further apparent that the arbitrability of the impasse between ATU and TARTA for a successor CBA does not derive from the Operations Funding Agreement.

{¶ 51} We find Congress never intended for the Operations Funding Agreement to independently create any labor relations rights for ATU and TARTA. We find the now-expired CBA never referenced in any manner section 13(c) of UMTA or the Operations Funding Agreement. We further find R.C. 4117.14 does not mandate the parties submit to interest arbitration for their impasse to a successor CBA. Interest arbitration is a matter of consent, and as a matter of state law we find that ATU and TARTA did not consent to submit their 2011 impasse for a successor CBA to federal interest arbitration in the 1975 Operations Funding Agreement.

{¶ 52} R.C. 4117.10(A) states, "[T]his chapter prevails over any and all other conflicting laws, resolutions, provisions, present or future, except as otherwise specified in this chapter or as otherwise specified by the general assembly" with limited exceptions. This court previously identified that among those limited exceptions is R.C. 4981.21 as necessary to comply with section 13(c) of UMTA. *Amalgamated Transit*, 2013-Ohio-4412, 2 N.E.3d 289, at ¶ 18. We find that R.C. 4981.21 concerns lessees who pay a special assessment on real property owned by the Ohio rail development commission, and there is nothing in the record of this appeal to indicate that the Section

27.

13(c) Agreements are responsive to R.C. 4981.21, so the exception under R.C. 4117.10(A) does not apply.

{¶ 53} Upon de novo review we find the parties did not agree to submit their impasse for a successor public-sector CBA to interest arbitration pursuant to the Section 13(c) Agreements in the record.

{¶ 54} TARTA's first assignment of error is well-taken.

{¶ 55} In light of our determinations on the first and second assignments of error, the third assignment of error is moot. App.R. 12(A)(1)(c).

### III.    Conclusion

{¶ 56} On consideration whereof, the judgment of the Lucas County Court of Common Pleas is reversed and remanded for further proceedings. ATU is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed<br>and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

28.

Amalgamated Transit Union,
AFL-CIO, Local 697 v. Toledo
Area Regional Transit Auth.
C.A. No. L-19-1197

Arlene Singer, J.

_____
JUDGE

Thomas J. Osowik, J.

_____
JUDGE

Gene A. Zmuda, P.J.
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.