[Cite as *State ex rel. Back v. State Teachers Retirement Bd.*, 2025-Ohio-5644.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Lauren Back, | : | |
| Relator, | : | No. 24AP-138 |
| v. | : | (REGULAR CALENDAR) |
| State Teachers Retirement System et al., | : | |
| Respondents. | : | |

D E C I S I O N

Rendered on December 18, 2025

**On brief:** *Gary A. Reeve*, for relator. **Argued:** *Gary A. Reeve*.

**On brief:** *McCaslin, Imbus & McCaslin*, and *Joseph C. Gruber*, for respondent Thyssenkrupp Bilstein of America, Inc.

**On brief:** *Dave Yost*, Attorney General, *Samuel A. Peppers, II*, and *Lisa A. Reid*, for respondents State Teachers Retirement System and State Teachers Retirement System Board. **Argued:** *Lisa A. Reid*.

IN MANDAMUS
ON OBJECTIONS TO MAGISTRATE'S DECISION

BEATTY BLUNT, J.

{¶ 1} Lauren Back, relator, has filed objections to the decision of this court's magistrate that recommended denial of her petition for a writ of mandamus. Her petition seeks a of writ mandamus ordering respondents, State Teachers Retirement System ("STRS") and State Teachers Retirement System Board ("the board" or "STRS board") to reinstate her disability benefits appeal, or to instruct the respondents to vacate the termination of her benefits and grant such benefits retroactively to the date of termination.

STRS cancelled Back's appeal of the termination of her disability benefits because it found that she had performed a prohibited "teaching service" under R.C. 3307.48(D) and Adm.Code 3307:1-7-01(D), based on her presentation to a student group workshop at Padua Franciscan High School, of which she was an alumni.

{¶ 2} When she initially requested and received disability benefits in 2014, Back signed an acknowledgement that during her period of disability she could not "perform any teaching service [including] leading workshops; providing training; instructing students of any age; or directing teachers, student teachers, or students." (Stip. at 484.) Back was reminded of the requirement that she refrain from teaching services several times while she was receiving disability payments. (*See*, *e.g.*, Appended Mag.'s Decision at ¶ 27-36 (citing record to three notices in 2015, one in 2016, and another in 2018).) And, STRS had already recommended termination of Back's disability benefits on the merits of her asserted disability claim when she made her presentation at Padua Franciscan High School—Back was waiting on her final appeal hearing when she presented at the workshop, but upon discovery of her presentation that final appeal hearing was cancelled.

{¶ 3} On review of her mandamus petition, the magistrate determined that there was sufficient evidence to conclude that Back's activities at the school constituted a "teaching service" pursuant to R.C. 3307.48(D) and Adm.Code 3307:1-7-01(D), and that therefore STRS had acted properly in terminating her disability compensation and her appeal of the benefits termination. Back argues that "under a reasonable interpretation" of the regulation she did not perform a "teaching service," that even if she did perform a "teaching service" STRS should not necessarily be permitted to terminate her benefits, and that STRS's "unlawful determination" that Back had performed a "teaching service" denied her the substantive right to continue to appeal the termination of her previously-granted disability benefit.

## I. FACTUAL AND PROCEDURAL BACKGROUND

{¶ 4} Back obtained her eligibility for STRS by teaching for the Dayton Public School system. In late 2014, she applied for disability benefits, and in December 2014, STRS approved her application for disability benefits for ventricular tachycardia retroactive to June 2014. (*See* Mag.'s Decision at ¶ 27-28.) Her benefits were reviewed and reapproved

in April 2016, July 2017, and September 2019, and during that period STRS also allowed her additional claim for post-traumatic stress disorder ("PTSD"). *Id*. at ¶ 35.

{¶ 5} In the second half of 2022, Back was sent to independent medical examinations ("IMEs") for both allowed claims, as part of a review of the continuing claims. Both IMEs concluded that her disability benefits should not continue. *Id*. at ¶ 37. Back was informed of these recommendations and the anticipated termination of her disability benefits in December 2022, and in February 2023 the STRS board ordered her benefits to be terminated effective May 31, 2023. *Id*. at ¶ 38-39. Back then appealed and continued to receive benefits during the pendency of that appeal, which was scheduled to be heard on August 16, 2023.

{¶ 6} But on August 11, 2023, STRS sent Back a letter cancelling the appeal hearing:

> This letter is to notify you that we received information that you performed teaching services on March 16, 2023, at Padua Franciscan High School where you ran a workshop for business students called "How to Be an Entrepreneur." Our appeal confirmation letter to you dated March 8, 2023, stated if you return to work in any STRS Ohio covered position or other teaching service, your appeal hearing will be cancelled. **Therefore, your appeal hearing previously scheduled for August 16, 2023, is cancelled**.

> The STRS Ohio Retirement Board took official action on February 16, 2023, to terminate your disability benefits effective May 31, 2023. You were notified if you returned to teaching service before that date, your benefits would terminate on the day prior to your reemployment. Your disability termination date has been revised to March 15, 2023. Additional information about reimbursement of benefits not due will be sent separately.

(Emphasis in original.) (Aug. 11, 2023 Correspondence of STRS to Lauren Back (Stip. at 566-567.). *See also* Appended Mag.'s Decision at ¶ 43.)

{¶ 7} Back filed a pleading requesting reconsideration of STRS's "NOTICE OF APPEAL OF CANCELLATION OF APPEAL HEARING DUE TO DETERMINATION OF PRIOR TEACHING SERVICES" on September 7, 2023, and attached an August 18 letter from Jason Dzik, the teacher who organized and was present at the workshop. (Sept. 7, 2023 Fascimile Sheet & Appeal filed by Attorney O'Donnell (Stip. at 568-575).) Dzik stated

that Back had spoken to the Padua Franciscan High School MyTrack student group, which is similar to a club, about her path as an entrepreneur for roughly 20 minutes and then answered questions from the group. He stated that he had described her presentation as a "workshop" as opposed to a "speaker" on social media to attract additional students and to encourage students to interact with Back by asking questions. He stated that Back told the story of her entrepreneurial journey, handed out samples of her "Back Attack Snacks," and answered the students' questions, but that she did not teach any lessons or conduct any other activities. (Appended Mag.'s Decision at ¶ 44.)

{¶ 8} In a September 22, 2023 letter, STRS denied her request for reconsideration and affirmed its refusal to review Back's appeal of the termination of benefits. And in an October 2, 2023 letter, STRS informed Back that she was responsible for reimbursing $5,401.45 in overpayment of benefits paid between March 15 and May 31, 2023. *Id.* at ¶ 39-41.

{¶ 9} Back filed the instant petition for writ of mandamus on February 22, 2024. This court referred the case to a magistrate on February 27, 2024, pursuant to Loc.R. 13(M) and Civ.R. 53. Following the submission of stipulated evidence and briefs, the magistrate issued a decision recommending denial of the writ on February 27, 2025. The case is now before this court on Back's objection to that decision.

## II. RELEVANT LEGAL STANDARDS AND SUBSTANTIVE LAW

{¶ 10} A writ of mandamus is an extraordinary remedy that " 'command[s] the performance of an act which the law specifically enjoins as a duty.' " *State ex rel. Russell v. Klatt*, 2020-Ohio-875, ¶ 7, quoting R.C. 2731.01. For a writ of mandamus to issue in this matter, Back must establish by clear and convincing evidence that she has a clear legal right to the requested relief reinstating her appeal or her benefits, that STRS has a clear legal duty to reinstate her appeal or her benefits, and that she has no other adequate remedy in the ordinary course of the law. *See, e.g., State ex rel. Gil-Llamas v. Hardin*, 2021-Ohio-1508, ¶ 19. "[C]lear and convincing evidence produces in the trier of fact's mind a firm belief of the fact sought to be established." *See, e.g., State ex rel. Ware v. Crawford*, 2022-Ohio-295, ¶ 14.

{¶ 11} R.C. 3307.48(D) provides:

> *An individual receiving a disability benefit from the system shall be ineligible to perform any teaching service, as defined by the board.* A disability benefit shall immediately terminate if the disability benefit recipient performs any teaching service in this state or elsewhere. The board shall notify the recipient that the benefit is terminated. The recipient may submit, not later than thirty days after the date the notice is sent, to the board information specifying that the disability recipient did not perform teaching services while receiving disability benefits along with any supporting evidence available to the recipient. The board shall review the information and any accompanying evidence to determine whether the individual performed teaching services. The board may designate an individual to review the information and submit a recommendation to the board. The board shall determine whether the benefit was correctly terminated. If not, the benefit shall be reinstated and any missed payments paid to the recipient. *The board's decision is final.*

(Emphasis added.) *Id.* Accordingly, the statute provides authority to the STRS board to define the activities that constitute a "teaching service" which would render a claimant ineligible for disability benefits. The board has set forth its definition of those activities in Adm.Code 3307:1-7-01(D):

> For purposes of section 3307.48 of the Revised Code, to "perform any teaching service" whether or not such services or positions are performed full-time or part-time, in a public or private employment school or non-school setting, on a volunteer basis or for compensation, in or outside the state of Ohio includes any of the following:
>
> (1) *All employment, contracted services or volunteer work that if performed in an Ohio public school would be considered employment covered by the retirement system as defined in section 3307.01 of the Revised Code.*
>
> (2) All teachers, tutors, substitute teachers, electronic classroom instructors, daycare teachers, community school instructors and private-lesson providers whether the service was performed through employment, contracted services, or volunteer work.
>
> (3) *All employment contracted services, or volunteer work that relates to the work of educators, such as, but not limited to, writing curriculum, leading workshops, providing training, instructing students of any age, or directing teachers, student teachers or students.*

> (4) *Any other service determined by the retirement board to be performing teaching services.*

(Emphasis added.) *Id.*

## III. ANALYSIS AND APPLICATION

{¶ 12} We conclude that, based on the broad language in the first sentence of R.C. 3307.48(D), the respondents were permitted to define "teaching service" quite broadly, and based on that statute's last sentence, the board's determination as to whether a claimant performed a "teaching service" and was therefore ineligible for benefits was "final."

{¶ 13} While Back's activity in presenting to the Padua Franciscan High School MyTrack student group was undoubtedly minimal, that activity squarely fits within the definition set forth under subsection (D)(3) of Adm.Code 3307:1-7-01(D) as "volunteer work that relates to the work of educators, such as . . . leading workshops, providing training, instructing students of any age, or directing . . . students." Moreover, her presentation arguably constitutes "volunteer work that if performed in an Ohio public school would be considered employment covered by the retirement system as defined in section 3307.01 of the Revised Code" as prohibited by subsection (D)(1) of the rule, and certainly falls within the "catch-all" prohibition of subsection (D)(4) of the rule. Moreover, Back cannot claim she was not on notice that she wasn't permitted to engage in "teaching services" while she was on disability. According to the stipulated record, she received specific notices that she was not permitted to engage in teaching services on November 17, 2014; February 19, 2015; March 2, 2015; April 9, 2015; March 2, 2016; and also in 2018. (*See, e.g.*, Appended Mag.'s Decision at ¶ 20-29 (citing record evidence).)

{¶ 14} Back's essential argument here is not that STRS's definition of "perform any teaching service" in Adm.Code 3307:1-7-01(D) is improper. Rather, her main objection is that the definition is unnecessarily overbroad. (*See* Relator Obj.'s to Mag.'s Decision at 6-7.) But to obtain a writ of mandamus, Back must demonstrate that she had a legal right to benefits and that STRS has a legal duty to continue her benefits. Even if we accept that the definition is unnecessarily overbroad, that does not and indeed cannot show that she is entitled to the issuance of a writ.

{¶ 15} Back has wholly failed to point to any law or fact supporting the claim that STRS had a legal duty to conclude her presentation was not the performance of a teaching

service, and Back has similarly not shown that she is legally entitled to either reinstatement of her benefits or reinstatement of her appeal of the termination of those benefits. We therefore overrule Back's objections.

## IV. CONCLUSION

{¶ 16} We adopt and approve the magistrate's decision, which is set forth in the appendix to the decision, in full. Back's petition for a writ of mandamus is accordingly denied.

*Objections overruled*;
*writ of mandamus denied*.

JAMISON, P.J., concurs.
DINGUS, J., dissenting.

———————————————

DINGUS, J., dissenting.

{¶ 17} Because I disagree that the General Assembly intended the phrase "perform any teaching service" to include speaking to a small group of students for a single 20-minute period about a broad topic, I respectfully dissent.

{¶ 18} This case turns on the meaning of the phrase "perform any teaching service" as used in R.C. 3307.48(D). While the magistrate focused on interpreting the term "leading [a] workshop" as used in Adm.Code 3307:1-7-01(D)(3), the proper focus of this court should be to determine the intent of the General Assembly in its use of the phrase "perform any teaching service." *See Knollman-Wade Holdings, L.L.C. v. Platinum Ridge Properties, L.L.C.*, 2015-Ohio-1619, ¶ 14 (10th Dist.), citing *Brooks Capital Servs., L.L.C. v. 5151 Trabue Ltd.*, 2012 Ohio App. LEXIS 3901, *8-9 (10th Dist.) ("The primary goal of statutory interpretation is to ascertain and give effect to the General Assembly's intent in enacting the statute."). To determine the legislative intent behind the phrase, we must first determine whether it is " 'plain and unambiguous and conveys a clear and definite meaning.' " *Jacobson v. Kaforey*, 2016-Ohio-8434, ¶ 8, quoting *Sears v. Weimer*, 143 Ohio St. 312, 316 (1944). If the term is " 'capable of bearing more than one meaning,' " it is ambiguous. *Id.*, quoting *Dunbar v. State*, 2013-Ohio-2163, ¶ 16.

{¶ 19} Here, the majority finds "perform any teaching service" to be ambiguous. And I agree. "Teaching service" is neither defined in a dictionary nor commonly used in the English language. It is also capable of numerous meanings, including both inside and

outside of an academic setting. Therefore, "perform any teaching service" is clearly ambiguous and subject to judicial interpretation.

{¶ 20} To interpret an ambiguous statute and determine the General Assembly's intent, the court may consider several factors, including the object sought to be obtained, the circumstances under which the statute was enacted, the legislative history, the consequences of a particular construction, and the administrative construction of the statute. R.C. 1.49; *see also State v. Black*, 2015-Ohio-513, ¶ 38. The majority interprets "perform any teaching service" by relying exclusively on the construction of the statute by the State Teachers Retirement System Board ("the board"). But this court is not confined to considering that single factor. In fact, the Supreme Court of Ohio has made clear that "it is never mandatory for a court to defer to the judgment of an administrative agency." *TWISM Ents., L.L.C. v. State Bd. of Registration for Professional Engineers & Surveyors*, 2022-Ohio-4677, ¶ 42. "In our constitutional system, it is exclusively [] 'the province and duty of the judicial department to say what the law is.' " *Id.* at ¶ 43, quoting *Marbury v. Madison*, 5 U.S. 137, 177 (1803). But this court *may* consider an agency's construction as one factor in its interpretation of an ambiguous statute, depending on the persuasive power of the agency's interpretation. *Id.* at ¶ 45.

{¶ 21} While I agree that the board's interpretation of "teaching service" is entitled to some persuasive power, I find that the other factors contained in R.C. 1.49 far outweigh, and are counter to, that interpretation. Let's start with "the object sought to be obtained." R.C. 1.49(A). Context is important. "When reviewing a statute, we cannot ' "pick out one sentence and disassociate it from the context." ' " *Jacobson* at ¶ 19, quoting *MacDonald v. Bernard*, 1 Ohio St.3d 85, 89 (1982), quoting *Black-Clawson Co. v. Evatt*, 139 Ohio St. 100, 104 (1941). We instead focus on everything within " 'the four corners of the enactment [in order to] determine the intent of the enacting body.' " *MacDonald* at 89, quoting *Black-Clawson* at 104. The statute in question is in Chapter 3307 of the Revised Code, which contains rules limited to the State Teachers Retirement System, which itself is limited to teachers. *See generally* R.C. 3307.01(B)(1). The statute does not apply to members of the general public or even to other school employees. *See* R.C. 3309.01. So, "perform any teaching service" must be interpreted in the context of teaching, or more specifically to the goal of limiting the payment of disability benefits to those teachers who are truly unable to

teach. Teaching requires special skills, and often extensive education and training. Speaking once to a small group for 20 minutes to share personal experiences does not require the use of those special skills, and it certainly does not transform the speaker into a teacher; the act of teaching involves far more than that. Considering this context, the General Assembly clearly did not intend for "teaching service" to include an isolated instance of recounting personal experiences.

{¶ 22} And then there's the consequences of the board's construction. If the broad descriptions contained in Adm.Code 3307:1-7-01(D)(1) through (4) to define "perform any teaching service," are to have full effect, disabled teachers will be prohibited in the future from engaging in countless activities, including those that no person, much less a teacher, would ever envision would disqualify them from receiving disability benefits. For example, if a disabled teacher is prohibited from speaking to a small group once about personal experiences, then clearly no disabled teacher will ever be permitted to deliver a commencement speech to an entire graduating class. Similarly, a disabled teacher who is part of a knitting group could be terminated from the disability system for sharing a new knitting technique with a fellow member. The same consequence could apply to participating in a book club, helping children or grandchildren with homework, contributing personal insights during a Sunday School class, or even sharing a recipe with others. The absurdities are endless. Even a plain and unambiguous statute will not be enforced if it produces an unintended, absurd result. *State ex rel. Clay v. Cuyahoga Cty. Med. Examiner's Office,* 2017-Ohio-8714, ¶ 23. This court should likewise not interpret a statute in a manner that produces an absurd result.

{¶ 23} For these reasons, I would hold that the phrase "perform any teaching service" does not include an isolated act of speaking to a group about personal and work experiences, and that the board's decision to define the phrase in such a manner was improper. In the absence of this definition, the board had a legal duty to reinstate Back's appeal of the termination of her benefits, and as such, I would sustain Back's objections and issue the writ of mandamus.

_____

**APPENDIX**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Lauren Back, | : | |
| Relator, | : | |
| v. | : | No. 24AP-138 |
| State Teachers Retirement System et al., | : | (REGULAR CALENDAR) |
| Respondents. | : | |

M A G I S T R A T E ' S   D E C I S I O N

Rendered on February 27, 2025

*Gary A. Reeve*, for relator.

*McCaslin*, *Imbus & McCaslin*, and *Joseph C. Gruber*, for respondent Thyssenkrupp Bilstein of America, Inc.

*Dave Yost*, Attorney General, and *Samuel A. Peppers*, *II*, and *Lisa A. Reid*, for respondent State Teachers Retirement System and State Teachers Retirement System Board.

IN MANDAMUS

{¶ 24} Relator, Lauren Back, has filed this original action requesting that this court issue a writ mandamus ordering respondents State Teachers Retirement System ("STRS") and State Teachers Retirement System Board ("the board" or "STRS board"): (1) to vacate respondents' cancellation of relator's appeal and process the appeal review in the normal fashion; or (2) to vacate their removal of relator's disability benefits and grant her disability benefits retroactive to the date they were cancelled.

Findings of Fact:

{¶ 25} 1. Relator is an eligible participant in STRS through her teaching job at Dayton Public Schools.

{¶ 26} 2. Respondents are responsible for the administration of disability benefits and the adjudication of claims under the system.

{¶ 27} 3. In a November 17, 2014, application, relator applied for disability benefits under the system based upon arrhythmogenic right ventricular dysplasia. In the disability-benefit application signed by relator, relator acknowledged the following, in pertinent part:

> Reemployment Restrictions
>
> I understand that if my application for disability benefits is approved by the State Teachers Retirement Board and I am receiving disability benefits:
>
> ● I may not perform any teaching service as defined below.
>
> - All employment, contracted services or volunteer work, that if performed in an Ohio public school would be covered by STRS Ohio; and
>
> - All teachers, tutors, substitute teachers, electronic classroom instructors, daycare teachers, community school instructors and private-lesson providers; and
>
> - Work that relates to the work of educators, such as but not limited to, writing curriculum; leading workshops; providing training; instructing students of any age; or directing teachers, student teachers or students.

(Stip. at 484.)

{¶ 28} 4. An STRS brochure relator received in November 2014, entitled "Questions and Answers about Applying for a Disability Benefit," provided the following, in pertinent part:

> A disability benefit terminates if the disability benefit recipient performs any teaching services. Teaching service is defined as any position performed in a public or private setting that, if performed in Ohio public schools or institutions of higher education, would contribute to STRS Ohio. This includes paid or

volunteer service as tutors, substitutes, electronic classroom instructors, coaches, and private-lesson providers, in or outside Ohio.

. . .

If you are considering employment after the approval of your disability benefits, forward an official job description to STRS Ohio for review before accepting any position.

(Stip. at 465, 469.)

{¶ 29} 5. In December 2014, respondents granted relator disability benefits for ventricular tachycardia retroactive to June 2014.

{¶ 30} 6. A February 19, 2015, notification from STRS informed relator, as follows:

A disability benefit terminates if the **disability benefit recipient performs any teaching service.** Performing teaching service includes any and all teaching service, as well as any service that you participate in that is similar to the position held as a contributing member of STRS Ohio, whether full-time or part-time, in a public or private setting or on a volunteer basis, in or outside the state of Ohio. This includes tutors, substitutes, electronic classroom instructors, private-lesson providers, and supplemental work such as coaching. Additionally, if you are found to be teaching, both the disability benefits received and the health care and prescription drug claims paid on behalf of the individual from the beginning of the teaching service shall be repaid to the retirement system.

. . .

If you are considering employment, you must forward a job description to STRS Ohio for review before accepting any position.

 (Emphasis in original.) (Stip. at 491.)

{¶ 31} 7. In 2015, STRS presented relator a form entitled, "Questions You May Have About Your Disability Allowance Benefits," which provided, in pertinent part:

Disability benefits could also terminate:

● If you perform any teaching service in any public or private school or institution, in Ohio or elsewhere[.]

(Stip. at 493.)

{¶ 32} 8. On March 2, 2015, relator completed a form entitled, "Disability Information For Payment of Benefit," in which she attested, as follows:

I understand that disability benefit recipients may not perform any teaching service or become employed in a position similar to the position held as a contributing member of STRS Ohio, whether full time or part time, in any public or private employment setting, on a volunteer basis or for compensation, in or outside the state of Ohio. I understand that this includes tutors, substitutes, electronic classroom instructors, community school instructors and private-lesson providers, in or outside Ohio. I understand any other employment normally related to or covered by STRS Ohio is also prohibited.

(Stip. at 494, 499.)

{¶ 33} 9. On April 9, 2015, STRS sent a letter to relator, which provided, in pertinent part: "Your disability benefit will terminate if you return to private or public teaching in this state or elsewhere." (Stip. at 502.) That letter contained a document entitled, "EMPLOYMENT AND REEXAMINATION GUIDELINES FOR DISABILITY BENEFIT RECIPIENTS," which included the same employment-limitation language included in the November 17, 2014, application. (Stip. at 504.)

{¶ 34} 10. On March 2, 2016, STRS sent to relator a "Statement of Employment and Earnings After Receipt of a Disability Benefit," which provided the same employment-restriction language contained in the November 17, 2014, application. (Stip. at 510.) STRS sent this form to relator every year, and the form contained the same language regarding work restrictions. Relator completed these statements for the years 2016 through 2022.

{¶ 35} 11. These benefits were confirmed in April 2016, July 2017, and September 2019. Her claim was also allowed for post-traumatic stress disorder.

{¶ 36} 12. In approximately 2018, a document entitled "Teaching Limitations for Disability Benefit Recipients," was included with the earnings statement form, providing, in pertinent part:

Disability benefit recipients sometimes ask if they can teach while receiving benefits. The simple answer to this question is

no. You may not perform any teaching services while receiving STRS Ohio disability benefits. This includes any traditional or nontraditional teaching activity, whether full time or part time, in a public or private setting, school or nonschool setting, on a volunteer basis or for compensation, in or outside the state of Ohio[.]

Below are some common examples of traditional and nontraditional teaching activities that are not permitted while receiving disability benefits. Please note, this is not a complete list. To find out if any activity qualifies as teaching service, please contact STRS Ohio.

● Any employment covered by STRS Ohio
● Electronic classroom instructors
● Private and community school teachers
● Tutors
● Day care teachers
● Private-lesson providers
● Duties that relate to the work of educators (e.g., writing curriculum, leading workshops and providing training)
● Coaching
● Teaching private art classes or piano lessons
● Mentoring students academically
● Teaching Bible studies
● Writing curriculum for any organization

You also cannot perform duties similar to your STRS Ohio position while receiving disability benefits. For instance, a school nurse cannot be a private nurse, a band director cannot direct a city orchestra, a theater teacher cannot direct a local play, and a music teacher cannot lead a choir.

. . .

What happens if you teach while receiving disability benefits?

Your STRS Ohio disability benefit will **terminate** immediately if you perform any teaching service. Please note that a retroactive termination would require a repayment of benefits.
. . .

**Plan ahead!** If you are considering employment or volunteer work, send a job description of the duties to STRS Ohio for preapproval.

(Emphasis in original.) (Stip. at 521-22.)

{¶ 37} 13. In October, November, and December 2022, claimant underwent independent medical examinations ("IME") and medical reviews for her conditions. The IMEs and medical reviews concluded that disability benefits should not continue.

{¶ 38} 14. In a December 22, 2022, letter, respondents informed relator that her disability benefits would be presented to the board for termination. The correspondence provided, "[i]f you return to any teaching or State Teachers Retirement System of Ohio covered service before the date set forth above, your benefit will terminate." (Stip. at 552.)

{¶ 39} 15. In a February 16, 2023, letter, respondents informed relator that her benefits were terminated, effective May 31, 2023. Relator appealed, after which time she continued to receive disability benefits.

{¶ 40} 16. In a March 8, 2023, letter, STRS informed relator that, "[i]f you return to work in any STRS Ohio covered position or other teaching service, your appeal hearing will be canceled." (Stip. at 557.)

{¶ 41} 17. On August 11, 2023, STRS discovered a social media post from Padua Franciscan High School, stating the following:

> Padua Alumna and entrepreneur Lauren (O'Donnell) Back
> '00 ran a workshop for MyTrack Business students called
> "How to be an Entrepreneur." She discussed successfully
> operating and marketing a business along with the process of
> turning an idea into a working business model. Students
> enjoyed samples of her Back Attack Snacks.

(Stip. at 560.)

{¶ 42} 18. The same post was shared on relator's business social media page, which stated the following:

> Last week, our co-founder and Padua Franciscan High School
> grad returned to her alma mater to provide her personal
> insight, experience, and business advice to this future
> generation of economic leaders!

*Id.*

{¶ 43} 19. In an August 11, 2023, letter, respondents notified relator that her appeal hearing had been cancelled, alleging that relator had "performed teaching services" on

March 16, 2023, by running the workshop at Padua Franciscan High School called "How to be an Entrepreneur." The termination was retroactive to March 15, 2023. Relator appealed.

{¶ 44}  20. Padua teacher Jason Dzik, the school's MyTrack Director, indicated in an August 18, 2023, letter that relator spoke to a student group, which is similar to a club, about her path as an entrepreneur for roughly 20 minutes and then answered questions from the group; Dzik was present during relator's interaction with the student group; relator did not take attendance, assign or grade any student work discipline students, or handle any of the responsibilities typically performed by teachers; Dzik, as the teacher and facilitator in the group, was responsible for all such tasks; Dzik was physically present in the room the entire time and can attest that relator's sole task was to tell her story to the group and answer a few questions; he phrased the social-media post as a "workshop," as opposed to a "speaker," to attract additional students and to encourage the speaker to approach the event in a workshop fashion to permit the students' interaction in terms of asking questions; relator told her story, handed out samples, and then answered the students' questions; and he kept the "workshop" language for the sake of consistency, though relator did not teach any lessons or conduct any activities.

{¶ 45}  21. In an August 18, 2023, letter, addressing the school's social-media post, Rachel DeGirolamo, the vice president of communication for Padua Franciscan High School, stated that a more accurate description of relator's involvement would have been that she served as a guest speaker on the topic of "How to Be an Entrepreneur," at the invitation of Dzik.

{¶ 46}  22. In a September 22, 2023, letter, respondents denied relator's appeal and affirmed its refusal to review her appeal of the termination of benefits.

{¶ 47}  23. The Padua Franciscan High School Fulltime Faculty Handbook for 2022-2023, provides that students must be under the supervision of a faculty member from 7:30 a.m. to 3:00 p.m.

{¶ 48}  24. In an October 2, 2023, letter, respondents informed relator that she was responsible for repaying $5,401.45 in overpayment of benefits paid between March 15, 2023, and May 31, 2023.

{¶ 49}  25. On February 22, 2024, relator filed the present petition for writ of mandamus.

Conclusions of Law and Discussion:

{¶ 50} The magistrate recommends that this court deny relator's petition for writ of mandamus.

{¶ 51} In order for this court to issue a writ of mandamus, a relator must ordinarily show a clear legal right to the relief sought, a clear legal duty on the part of the respondent to provide such relief, and the lack of an adequate remedy in the ordinary course of law. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967).

{¶ 52} Here, relator presents the following arguments: (1) under the regulatory definition, relator did not perform a "teaching service" at Padua; (2) relator acted as a single-time speaker to high school business-class students regarding being an entrepreneur; (3) the talk was given at the request of teacher Jason Dzik, the school's MyTrack Director, who supervised the students throughout the presentation; (4) Dzik indicated in an August 18, 2023, letter that relator spoke to a student group, which is similar to a club, about her path as an entrepreneur for roughly 20 minutes and then answered questions from the group; Dzik was present during relator's interaction with the student group; relator did not take attendance, assign or grade any student work, discipline students, or handle any of the responsibilities typically performed by teachers; Dzik, as the teacher and facilitator in the group, was responsible for all such tasks; Dzik was physically present in the room the entire time and can attest that relator's sole task was to tell her story to the group and answer a few questions; he phrased the social-media post as a "workshop," as opposed to a "speaker," to attract additional students and to encourage the speaker to approach the event in a workshop fashion to permit the students' interaction in terms of asking questions; relator told her story, handed out samples, and then answered the students' questions; and he kept the "workshop" language for the sake of consistency, though relator did not teach any lessons or conduct any activities; (5) the August 18, 2023, letter from DeGirolamo clarified that a more accurate description of relator's involvement would have been that she served as a guest speaker on the topic of "How to Be an Entrepreneur," at the invitation of Dzik; (6) the Padua Franciscan High School Fulltime Faculty Handbook for 2022-2023, provides that students must be under the supervision of a faculty member from 7:30 a.m. to 3:00 p.m.; (7) if relator's presentation was a "teaching

service," then every parent who appears at any career day event has performed a "teaching service"; (8) there is no case precedent on this issue; (9) relator telling her entrepreneurial story did not require her to exercise any teaching skills or training and could have been performed in a non-teaching capacity; (10) the single, short presentation during which she arrived at the school, spoke briefly, and left, cannot be a "teaching service"; (11) as a guest speaker, relator's activity would not be considered employment covered by the retirement system pursuant to R.C. 3307.01 if performed at an Ohio public school (Adm.Code 3307:1-7-01(D)(1)); (12) the school confirmed relator was not acting in the guise of a teacher or instructor of any kind, but merely as a guest speaker (Adm.Code 3307:1-7-01(D)(2)); (13) the school confirmed relator did not write curriculum, lead a workshop, provide training, instruct students, or direct teachers, student teachers, or students in any manner (Adm.Code 3307:1-7-01(D)(3)); (14) the catchall in Adm.Code 3307:1-7-01(D)(4) is inapplicable because STRS failed to define in its letter of cancellation what relator did that might fall into the catch-all provision; (15) STRS defined relator's activity as "running a workshop," but she did not chair a period of discussion and practical work on a particular subject but, instead, gave a short talk on her personal experiences as an entrepreneur, took a few questions from students, and left, which is more akin to a parent giving a career day talk and not like a teacher's duties; and (16) STRS used its unlawful determination regarding "teaching service" to deny her a substantive legal right to continue to appeal the denial of her previously granted disability benefits.

R.C. 3307.48(D) provides, in pertinent part, the following:

(D) An individual receiving a disability benefit from the system shall be ineligible to perform any teaching service, as defined by the board. A disability benefit shall immediately terminate if the disability benefit recipient performs any teaching service in this state or elsewhere. The board shall notify the recipient that the benefit is terminated. The recipient may submit, not later than thirty days after the date the notice is sent, to the board information specifying that the disability recipient did not perform teaching services while receiving disability benefits along with any supporting evidence available to the recipient. The board shall review the information and any accompanying evidence to determine whether the individual performed teaching services. The board may designate an individual to review the information and submit a recommendation to the board. The board shall determine whether the benefit was correctly terminated. If

not, the benefit shall be reinstated and any missed payments paid to the recipient. The board's decision is final.

Adm.Code 3307:1-7-01(D) provides, in pertinent part, the following:

(D) For purposes of section 3307.48 of the Revised Code, to "perform any teaching service" whether or not such services or positions are performed full-time or part-time, in a public or private employment school or non-school setting, on a volunteer basis or for compensation, in or outside the state of Ohio includes any of the following:

(1) All employment, contracted services or volunteer work that if performed in an Ohio public school would be considered employment covered by the retirement system as defined in section 3307.01 of the Revised Code.

(2) All teachers, tutors, substitute teachers, electronic classroom instructors, daycare teachers, community school instructors and private-lesson providers whether the service was performed through employment, contracted services, or volunteer work.

(3) All employment contracted services, or volunteer work that relates to the work of educators, such as, but not limited to, writing curriculum, leading workshops, providing training, instructing students of any age, or directing teachers, student teachers or students.

(4) Any other service determined by the retirement board to be performing teaching services.

{¶ 53} A court is not required to defer to an administrative agency's interpretation of a statute enacted by the General Assembly or application of case law issued by Ohio courts. *See TWISM Enters., L.L.C. v. State Bd. of Registration for Professional Engineers & Surveyors*, 2022-Ohio-4677, ¶ 3 (explaining that the judicial branch is never required to defer to an agency's interpretation of the law and an agency's interpretation is simply one consideration a court may sometimes take into account). Furthermore, a court will not defer to an administrative agency's interpretation of its own regulation but, instead, will independently interpret the regulations at issue. *State ex rel. Berry v. Indus. Comm. of Ohio*, 2024-Ohio-2616, ¶ 23 (10th Dist.). If the text of a regulation is clear, then we apply it as written and stop there. *Id.* But if we determine that the text is ambiguous, we may consider the agency's interpretation only for its persuasive power. *Id.*, citing *In re Alamo*

*Solar I, L.L.C.*, 2023-Ohio-3778, ¶ 44-45. When interpreting text involving common words used in their ordinary sense, there " 'will rarely, if ever, be a need for a court to look to an agency interpretation,' " as this is " 'well within the judiciary's core competence.' " *Id.*, quoting *TWISM* at ¶ 47, citing *Sarasota Mem. Hosp. v. Shalala*, 60 F.3d 1507, 1511 (11th Cir. 1995). However, the agency's interpretation on specialized matters that involve technical meaning within the agency's core competency may serve the court. *Id.*

{¶ 54} The primary goal of statutory interpretation is to determine and uphold "the General Assembly's intent in enacting the statute." *Knollman-Wade Holdings, LLC v. Platinum Ridge Properties, LLC*, 2015-Ohio-1619, ¶ 14 (10th Dist.). "In determining legislative intent, we must first look to the plain language of the statute." *Id.* As a general rule, the words and phrases of a statute will be read in context and construed according to the rules of grammar and common usage. R.C. 1.42. *See In re Acubens*, *LLC*, 2018-Ohio-2607, ¶ 14 (10th Dist.), citing *State ex rel. Rose v. Lorain Cty. Bd. of Elections*, 90 Ohio St.3d 229, 231 (2000). Where the language of a statute is plain and conveys a clear and definite meaning, there is no need for statutory interpretation. *State v. Banks*, 2011-Ohio-4252, ¶ 13 (10th Dist.). "If the [statute] is clear and unambiguous, as it is in this case, we must apply it as written." *State v. Ashcraft*, 2022-Ohio-4611, ¶ 7. We may look beyond the plain statutory language only when a definitive meaning remains elusive despite a thorough, objective examination of the language. *Ohio Neighborhood Fin., Inc. v. Scott*, 2014-Ohio-2440, ¶ 23, citing *State v. Porterfield*, 2005-Ohio-3095, ¶ 11.

{¶ 55} In the present case, after a review of the facts and the provisions contained in R.C. 3307.48(D) and Adm.Code 3307:1-7-01(D), the magistrate concurs with STRS's determination that relator's activities fall within the exceptionally broad language of "teaching service" provided in Adm.Code 3307:1-7-01(D). Having found no case law addressing Adm.Code 3307:1-7-01(D), the magistrate relies upon the common usage of its terms and finds such supports the board's determination. Initially, relator's arguments that her presentation to the high-school business-class students was only a single event, lasted only 20 minutes, took place before a group akin to a club, and was initiated by the request of a teacher are not helpful to the analysis. These factors have little relevance to whether relator's actions provided a "teaching service." Furthermore, relator's attempt to show how her activities differed from tasks a teacher performs by pointing out what her activities did

not include is unavailing. There is nothing in the statutory or regulatory language that requires the teaching service to include supervision, attendance monitoring, the assignment of grades, or the meting out of discipline.

{¶ 56} Instead, what activities relator actually did perform are relevant and jibe with the descriptions set forth in Adm.Code 3307:1-7-01(D). Despite relator's claim that she did not "lead [a] workshop[ ]," provide training, teach a lesson, or instruct students, relator's activities could be construed by the board as such. Relator was "teaching" the students by discussing her path as an entrepreneur, "telling her story" about her own business, and answering questions. Adm.Code 3307:1-7-01(D)(3) provides that a "teaching service" includes voluntary work that instructs students of any age. Relator's 20-minute discussion of her snack company and her answering of students' questions about her business can be reasonably read as falling within the purview of "teaching" and "instruction" to students. The August 11, 2023, social media post by the school indicated that relator discussed successfully operating and marketing a business, along with the process of turning an idea into a working business model. Relator's business social media page described that during the event, relator provided her personal insights, experience, and business advice to the students. At their fundamental core, relator's activities as a volunteer presenter instructed the students and taught them about business. Likewise, relator's discussion about her business is the same type of activity a business-class teacher might conduct at a school; thus, it would be considered employment covered by STRS, consistent with Adm.Code 3307:1-7-01(D)(1).

{¶ 57} The magistrate also finds that relator's activities constituted "leading [a] workshop[ ]." The term "workshop," although not defined in Adm.Code 3307:1-7-01(D)(3), is defined at https://www.dictionary.com/browse/workshop, accessed (February 9, 2025), as "a seminar, discussion group, or the like, that emphasizes exchange of ideas and the demonstration and application of techniques, skills, etc." Relator's activities comport with a reasonable reading of this definition. Dzik, the school's MyTrack Director, indicated that relator spoke to the student group, which is similar to a club, about her path as an entrepreneur for roughly 20 minutes and then answered questions from the group. Dzik said he termed the event as a "workshop" to attract additional students and to encourage the speaker to approach the event in a workshop fashion to permit the students' interaction

in terms of asking questions. The school's social media post indicated relator discussed successfully operating and marketing a business, as well as the process of turning an idea into a working business model, and relator's business social media page described that relator provided her personal insights, experience, and business advice to the students. According to Dzik's and the social media descriptions, relator's activities at the event resemble a discussion group involving the exchange of ideas and the demonstration of techniques and skills. Whether relator was "leading" the group is a grayer issue, as Dzik was the organizer of the event and was present throughout, but the magistrate finds that, for the period of her presentation, relator was "leading" the workshop. Thus, relator's presentation at the school event was consistent with "leading [a] workshop[ ]" pursuant to Adm.Code 3307:1-7-01(D)(3). For the above reasons, the magistrate concludes that relator's activities at the school constituted a "teaching service" pursuant to R.C. 3307.48(D) and Adm.Code 3307:1-7-01(D). Respondents properly terminated relator's disability compensation.

{¶ 58} Accordingly, it is the magistrate's decision that this court should deny relator's petition for writ of mandamus.

/S/ MAGISTRATE
THOMAS W. SCHOLL III

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b). A party may file written objections to the magistrate's decision within fourteen days of the filing of the decision.